IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RUBEN ARCHULETA, and TINA ARCHULETA,
as next friends and legal guardians of
LUKE ARCHULETA, a minor,

        Plaintiffs,

v.                                                                                                No.    24-CV-359

BOARD OF EDUCATION FOR
ESPANOLA PUBLIC SCHOOLS,
FILIBERTO "FIL" DOMINGUEZ,
JOEY TRUJILLO, and
HOLLY MARTINEZ,

        Defendants.

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiffs Ruben Archuleta and Tina Archuleta, as next friends and legal guardians of Luke Archuleta, a minor, by and through undersigned counsel, hereby file this Complaint for Damages and Declaratory Relief ("Complaint"). Plaintiffs bring claims against Defendants Board of Education for Española Public Schools ("EPS"), Filiberto "Fil" Dominguez, Joey Trujillo, and Holly Martinez (collectively referred to as "Defendants"). Plaintiffs bring claims against Defendants for violations of the United States Constitution pursuant to 42 U.S.C. § 1983, and the New Mexico Civil Rights Act ("NMCRA"), NMSA 1978 §§ 41-4A-1, *et. seq.*

### JURISDICTION AND VENUE

1.    This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a)(3). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

1

2. The United States District Court for the District of New Mexico is an appropriate venue under 28 U.S.C. § 1391(b)(2) because it is where the events giving rise to this claim occurred.

3. In connection with Plaintiffs' state law claims, Plaintiffs provided a timely notice to Defendants for claims under the NMCRA.

## PARTIES

1. Plaintiffs Ruben Archuleta and Tina Archuleta (occasionally referred to as the "parents") are residents of the State of New Mexico, County of Rio Arriba and the parents of Luke Archuleta (collectively referred to as "Plaintiffs" or by their first names).

2. Defendant Board of Education for Española Public Schools ("EPS") is a New Mexico Public School System located in Espanola, Rio Arriba County, New Mexico, which school board sanctions school sport activities, and employs the Individual Defendants. Defendant EPS is a "public body" pursuant to the New Mexico Civil Rights Act, NMSA 1978, § 41-4A-2, and those claims are brought exclusively against it. *See* NMSA 1978, § 41-4A-3(C).

3. Defendant Filiberto "Fil" Dominguez is a resident of the State of New Mexico, and an athletic coach for Espanola Valley High School at EPS. This defendant is sued in his individual and official capacity.

4. Defendant Joey Trujillo is a resident of the State of New Mexico, and an athletic coach for Espanola Valley High School at EPS. This defendant is sued in his individual and official capacity.

5. Defendant Holly Martinez is a resident of the State of New Mexico, and the Superintendent at EPS. Defendant Holly Martinez is a policymaker for Defendant EPS. This defendant is sued in his individual and official capacity.

**FACTUAL ALLEGATIONS**

I.   **Relevant state laws and rules regarding the licensing of 7-12 coaching staff.**

6.   The New Mexico Activities Association ("NMAA") is a nonprofit organization that regulates interscholastic programs for junior and senior high schools in New Mexico.

7.   Even though the NMAA is a private organization, it is regulated to great extent by the State of New Mexico. New Mexico law gives the Public Education Department ("PED") authority over "an association or organization attempting to regulate a public school activity," giving it authority to approve or disapprove rules and to require performance and financial audits, and requiring the organizations to comply with state laws. *See* NMSA 1978, § 22-2-2(L) (2019).

8.   The NMAA Rules provide that "coaches must have a coaching license issued by the [PED] and be an employee or have a contractual relationship with [the school district] (this applies to both voluntary and paid individuals.)" NMAA Handbook, Rule 3.3(A).

9.   "A paid or volunteer individual working with a school team…must be under contract of the local school district and satisfy all NMAA requirements associated with that person's role. All coaches…must be licensed." *Id.*

10.   The New Mexico Public School Insurance Authority regulations require that volunteers at its member schools sign a pledge committing to various conduct, including refraining from striking or assaulting a student. NMAC 6.50.18.8.

11.   The PED regulations require that all persons who perform athletic coaching be licensed by the PED. NMAC 6.63.8.8.

12.   Athletic coaching is defined as "athletic services in grades 7-12 performed by a head coach or assistant coach, paid or volunteer, for any athletic sport…" *Id.*

13.   EPS policy provides that "[a]ll coaching schedules will be managed by the athletic

3

director in accordance with [NMAA] guidelines. Head coaches, assistants and volunteer coaches shall be licensed by the state of New Mexico." Policy G-5050 Professional Staff Extra Duty.

    **II.**    **Policies and Rules Regarding Removal of Varsity Student Athletes from Athletic Programs.**

    14.    EPS policy provides that the "principal of a school may remove a student from a school-sponsored activity if the principal determines that the student has violated a provision of the student discipline policies, rules, and/or regulations or if the principal determines that such removal is in the best interest of the activity or in the best interest of the school as a whole." Policy J-4890.

    15.    These actions are delegated from the board to the superintendent, who delegates in turn to the principal.

    16.    There a no policies that allow the principal to delegate these actions to the coaching staff.

    17.    As a result, the person ultimately responsible is the superintendent as the policymaker.

    18.    It further provides that "[b]efore removing a student from an activity or position as a result of the student's violation of the student discipline policies, rules, and/or regulations, the principal must comply with the notice-and-hearing provisions of those policies, rules, and/or regulations." *Id.*

    19.    Moreover, this Policy states that "[b]efore removing a student from an activity or position for reasons other than a student's violation of the student discipline policies and/or regulations, the principal shall give written notice to the student." *Id.*

    20.    "The notice shall include the reason or reasons for the removal and the date that the removal is to become effective." *Id.*

21. "If the student disagrees with the principal's determination, the student may, within five (5) school days, request in writing a conference with the principal." *Id.*

22. "The conference shall be held as soon as practicable after the principal receives the written request." *Id.*

23. "At the conference, the student shall be given a full explanation of the reason or reasons for the action taken. The student shall be given an opportunity to present an explanation of the events relating to the action." *Id.*

24. This Policy and its enforcement are mandated by the State of New Mexico. *See* NMSA 1978, § 22-5-4.3.

25. Of important relevance as further explained below, the NMAA states that students who were a participant in an athletic program, any tryout period is considered practice, and thus, the student remains part of the program throughout his high-school education unless properly removed or voluntarily leaves the program. *See* NMAA Handbook, Section XIV, p. 10 (defining the term "practice" as "[a] structured period in which a coach or other agent of the school directs the activities of a sports team or part of a team. […] If a Student has been a participant in a particular athletic program the previous year, the start of the 'tryout period' is considered practice.").

**III.    Policies Regarding Violence Against Students.**

26. EPS policy provides that school employees "shall not, when on school property or off campus while representing the school or attending a school function, engage in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace" and that school employees "shall not engage in unprofessional conduct, which conduct shall include … striking, assaulting or restraining a student for no valid reason." Policy

5

G-0750 Staff Conduct.

### IV. Policies and Rules Regarding Discriminatory or Retaliatory Conduct Against Students with Medical Conditions.

27. EPS policy states that employees "shall not discriminate or permit students within our control, supervision or responsibility to discriminate against any other student on the basis of race, color, national origin, ethnicity, sex, sexual orientation, disability, religion, or serious medical condition[.]" *Id.*

28. Last, the NMAA Rules require that school districts comply with all state and federal laws and regulations, such as the NMHRA and the Americans with Disabilities Act, in determining whether a student is eligible to play a sport at a particular school. NMAA Handbook, Rules 6.1.4 and 6.12.2.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

29. At all relevant times, Luke was 16 years old and in the 11th grade at Española Valley High School ("EVHS").

30. During his time at EVHS, Luke was a star student and athlete.

31. Luke received high marks in his classes and was one of the best athletes at the EVHS' football and basketball programs—Luke played varsity for both teams.

32. Due to his exceptional grades, athleticism, and acumen, Luke planned on applying to the United States Military Academy West Point ("West Point").

33. Luke very likely could have obtained a recommendation from our United States Senators or Congresspeople to be admitted into West Point.

34. This all changed when Defendant Dominguez and Defendant Trujillo were hired by Defendant EPS, and Defendant Martinez to coach boys' basketball at EVHS.

35. Defendant Trujillo is the head coach and supervised Defendant Dominguez as his

assistant coach.

36. On May 27, 2022, Plaintiffs found out that Defendant Dominguez was hired.

37. Defendant Dominguez was introduced to the team that he would be on the new coaching staff and would be in charge until the new permanent coach, Defendant Trujillo, started the position later in the year.

38. Parents or students were never informed that new coaching staff were hired.

39. A formal introduction was never initiated.

40. Defendant Dominguez was not properly licensed until July 1st, 2022 and should have never been allowed to coach until licensed.

41. During a meeting with Defendant Martinez and Athletic Director Abeyta, neither could confirm whether the new coaching staff was formally cleared or licensed to be around children and to coach the basketball team.

42. Luke, Ruben, and Tina reported several times to Defendant Martinez that Defendant Dominguez was not licensed prior to July 1, 2022.

43. Defendant Martinez explained that she was new and was not aware of the process, rules, policies, or regulations that required the school to clear new staff and to ensure they are licensed per state law, and PED and NMAA regulations.

44. On June 3, 2022, players for EVHS, including Luke, were taken to play at a team camp for the basketball team at Santa Fe High School and Capitol High School.

45. During a game, Defendant Dominguez was noticeably upset with the team.

46. During a time out, Luke turned to another teammate and asked him a question and Defendant Dominguez turned to Luke and yelled at him, "Shut the fuck up!"

47. Defendant Dominguez yelled this loud enough that Luke's parents heard it in the

stands.

48. At the time, Luke's parents were not aware that this obscenity was directed at Luke.

49. Luke did not initially tell his parents of the incident, but after the game he was very quiet and did not want to talk about what happened during the game.

50. During the next game Luke was put in to play, he made a bad shot and Defendant Dominguez pulled him out of the game and yelled at him for taking "such a stupid shot."

51. Luke returned to the bench and sat down. Another child made the same shot a few moments later and was allowed to stay in the game.

52. At some point, Luke turned to another teammate and was discussing the game, a couple of minutes later Defendant Dominguez approached Luke and said something to Luke stating, "Especially you!" and forcefully placed his hands upon Luke and struck him in the head to the point his head snapped back.

53. Luke did not know what provoked Defendant Dominguez to assault and batter him.

54. Luke's teammate turned to him and said, "Damn, bro! [Defendant Dominguez] just little bro'd you."

55. Meaning that he is bullying Luke.

56. After the game, Luke was visibly upset but would not tell his parents what occurred.

57. Luke explained the incidents to his parents during an interview with Cristian Lopez, an employee investigating the incident, and Mr. Abeyta that he was fearful that after Defendant Dominguez forcefully poked him in the head, Defendant Dominguez would come back to hit him because he was enraged.

58. On June 4, 2022, Luke attended the game the next day and was not allowed to play as frequently as the other players.

59. He was visibly upset and still would not tell his parents what was going on.

60. Defendant Dominguez's retaliation against Luke began for reporting the abusive and bullyish behavior to Mr. Lopez and Mr. Abeyta.

61. Upon information and belief, Defendant Dominguez also became aggressive towards Luke because his parents questioned Defendants whether Defendant Dominguez had been cleared to be around students.

62. On June 5, 2022, during the first game of the day, Luke played minimally.

63. Defendant Dominguez was visibly upset with Luke and the team during the game to the point that parents approached Plaintiff Ruben Archuleta and complained about Defendant Dominguez and his behavior towards the team.

64. Luke approached his parents and told them, "I can't play anymore, [Defendant Dominguez] said I'm done."

65. Luke further stated that he was asking questions during the game and Defendant Dominguez did not like it, so he told him to leave.

66. Plaintiff Ruben Archuleta approached Defendant Dominguez to inquire about the situation and if he should take his son home. Defendant Dominguez first response was, "You need to help me with him."

67. Plaintiff Ruben Archuleta asked how he could help.

68. Defendant Dominguez went on to complain about Luke and his bad behavior. At some point he told Plaintiff Ruben Archuleta, "I almost got in a fight with another parent because of Luke."

69. Defendant Dominguez went on to tell everything that he believed was wrong with Luke to Plaintiff Ruben Archuleta.

70. He focused on how Luke should not have been allowed to play varsity the previous year.

71. Plaintiff Ruben Archuleta explained that it was not Luke's decision where he played and there was nothing they could do at this point in relation to the previous year.

72. Defendant Dominguez threatened several times that this was his last chance and that he would be letting the new coach know of his bad behavior.

73. Luke and his parents returned to the next game, and he told Luke he would not be allowed to play with the team, and he would be demoted to play with the junior varsity.

74. Despite this, Luke was allowed to play because another player was hurt.

75. During the game, Defendant Dominguez was agitated and frustrated with the team.

76. When the game ended, Luke was visibly upset and would not communicate with his parents.

77. Sometime that day, Plaintiffs found out that Defendant Dominguez was not cleared by EPS, Defendant Martinez, or Mr. Abeyta to coach the team.

78. Luke continued to attend practice and the new permanent coach, Defendant Trujillo, started his position.

79. Luke attended a team camp in Moriarty, New Mexico.

80. Luke was demoted from the regular position to a second-string position.

81. Defendant Trujillo demoted Luke without explanation.

82. Upon information and belief, Defendant Trujillo received recommendations from Defendant Dominguez, and thus, was done intentionally.

83. On June 22, 2022, Luke attended practice, during that time he and another teammate became engaged in a verbal argument, the other kid told Luke that he was not a good

player several times.

84. Defendant Trujillo was present and did not control the situation.

85. Defendant Trujillo screamed at Luke that he needed to leave, and he was not allowed to play.

86. Defendant Trujillo did not do the same to the other student athlete.

87. Luke called his father crying stating that Defendant Trujillo had thrown him out of practice.

88. Luke's parents were never informed that he was asked to leave practice.

89. Luke's parents tried calling Luke to find out his whereabouts and they were not able to locate him, until they went to the high school and found him there visibly upset.

90. Tina asked Luke what happened, and he explained the situation.

91. Luke also said that Defendant Trujillo sent Defendant Dominguez to go talk to him.

92. At that time, Luke asked Defendant Dominguez to get away from him, that he made him feel unsafe because he had put his hands on him in the past.

93. Defendant Dominguez told Luke he was a liar.

94. Tina was upset by this, so she approached Defendant Trujillo and Mr. Abeyta and asked if she could talk to them about the incident involving Luke.

95. Defendant Trujillo went on to tell her how horrible Luke was and how he had a bad attitude.

96. Defendant Trujillo was very argumentative and abusive during the conversation.

97. At that time, Plaintiffs reported the verbal and physical abuse of Luke.

98. Defendant Trujillo told her that he had full faith in his coaches, and he did not believe that happened.

11

99. She asked him if he was calling Luke a liar and he responded that he was indeed calling Luke a liar.

100. Tina explained to Defendant Trujillo and Mr. Abeyta that she felt like he was retaliating against Luke because of the incident between Luke and Defendant Dominguez.

101. On July 8, 2022, Ruben made an appointment with Defendant Martinez to discuss the situation.

102. Mr. Abeyta nor Defendant Trujillo reported the retaliatory conduct to her.

103. Defendant Martinez assured Ruben that she would take care of the situation.

104. These types of incidents must be reported, and all Defendants failed to do so.

105. On July 18, 2022, Tina, Mr. Abeyta, former EVHS Principal Jeffrey Sagor, Security Director Cristian Lopez and Defendant Martinez met to discuss the incident.

106. During that time, it was communicated that an investigation was being conducted.

107. Mr. Lopez and Mr. Abeyta would interview Luke the next day.

108. Luke's parents were told that Defendant Dominguez would not be allowed at practice until an investigation was completed.

109. Also, during the meeting, Tina asked why Defendant Dominguez and Defendant Trujillo were allowed to be at practice since their contract date stated July 1st, 2022.

110. Mr. Abeyta stated they were volunteers.

111. Tina then stated that they still needed a contract whether they were volunteers or not.

112. She also asked why the other assistant coaches were allowed to be around the players without a background check or being drug tested per the New Mexico Public Education Department requirements.

113. Mr. Abeyta and Defendant Martinez could not and did not have an answer. Defendant Dominguez was allowed to be there throughout the summer by Defendant Martinez even though he was not cleared and did not have a license.

114. After the meeting, Defendant Martinez and Mr. Abeyta proceeded to the HR office to inquire.

115. On July 19, 2022, Luke was interviewed by Mr. Lopez and Mr. Abeyta.

116. On July 20, 2022, Mr. Lopez was placed on administrative leave.

117. A full investigation was not completed due to Mr. Lopez being put on administrative leave for reasons unknown.

118. During this interview, Mr. Lopez and Mr. Abeyta assured Luke that Defendant Dominguez would not be allowed to attend practice until an investigation was done and the issue was resolved.

119. Nonetheless, Defendant Dominguez was allowed to return to practice on July 20, 2022.

120. Because Luke was a varsity player the prior year, Luke attended the basketball class offered at EVHS during school hours and throughout the semester and gained academic credit for his attendance and participation in this class.

121. On October 5, 2022, after several sessions with therapists, Luke's doctor provided a note to all Defendants stating that Luke suffered from anxiety, panic attacks, and depression as a result of the retaliation he endured from all Defendants.

122. All Defendants ignored Luke's medical note.

123. On November 14, 2022, Luke went to the EVHS routine tryouts, which are considered practice for him under NMAA Rules since he was a varsity player the prior school

year, for the basketball team.

124. Luke performed as expected and had a great performance.

125. Nonetheless, Luke was cut from the basketball team altogether by Defendant Dominguez and Defendant Trujillo in further retaliation against Luke, which here done with the intent to injure Luke by depriving him of participation in the basketball program and forcing a transfer to a school in a different town.

126. Defendants EPS and Martinez did not address any of Plaintiffs' complaints, including the fact that they were provided a medical note from Luke's doctor stating Luke's medical conditions and that requested that Defendant Dominguez and Trujillo not retaliate against Luke.

127. Defendant EPS's policy manual states that the coaching staff are supposed to meet with the student and explain the reasons for not making the team. This did not occur.

128. Using the "f" word on the bench and/or poking a student in the forehead for allegedly poor basketball play violates Policy G-0750.

129. Defendant Dominguez and Defendant Trujillo continued to retaliate against Luke until Luke was forced to transfer schools to Los Alamos High School.

130. Luke must drive every school day and for basketball events from Española to Los Alamos, and thus, must spend money that otherwise he would not have to spend.

131. To transfer and be able to play basketball at Los Alamos High School, Luke had to have a hardship and eligibility hearing in front of an NMAA panel.

132. The panel determined that Luke had a hardship because of the medical conditions inflicted upon him by Defendants and that he was eligible because he did not meet the definition of "tryout" which would have prevented him from playing if it was determined that he tried out

for the EVHS team but was not selected.

133. Rather, they determined that this tryout period was practice for Luke because he was a varsity player the year prior.

134. Luke continues to suffer from severe anxiety, panic attacks, and depression.

135. He has suffered severe panic attacks in the middle of the night.

136. Luke's academic and athletic reputation has been damaged by Defendants.

137. Luke continued to be intimated by Defendants Dominguez and Trujillo after he left EVHS for Los Alamos High School whenever these two schools would play against each other in basketball by mocking and laughing at Luke.

138. Luke continues to meet with therapists to help him with his serious medical condition.

139. On March 10, 2023, a second investigation was conducted by independent counsel.

140. That investigation found that Defendant Dominguez was not properly licensed at the time of the incidents and found that Luke's version of events was believable.

141. Despite this finding, Defendants Dominguez and Trujillo were never reprimanded, and did not receive training to address these issues.

## COUNT I
## FIRST AMENDMENT VIOLATION
## AGAINST ALL DEFENDANTS
## (RETALIATION)

142. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

143. As a result of Plaintiffs reporting that Defendant Dominguez was not licensed at the relevant times, Defendants EPS, Dominguez, Trujillo, and Martinez retaliated against Luke by demoting him from the basketball program, expelling him from the team, and forcing Luke to transfer schools.

144. As a result of Plaintiffs reporting that Defendant Dominguez assaulted and battered Luke in violation of policies and regulations, Defendants EPS, Dominguez, Trujillo, and Martinez retaliated against Luke by demoting him from the basketball program, expelling him from the team, and forcing Luke to transfer schools.

145. As a result of Plaintiffs reporting that Luke was diagnosed with a medical condition because of Defendant Dominguez's assault and battery upon Luke in violation of policies and regulations, Defendants EPS, Dominguez, Trujillo, and Martinez retaliated against Luke by demoting him from the basketball program, expelling him from the team, and forcing Luke to transfer schools.

146. Defendants EPS and Martinez have a policy and/or custom of hiring and retaining coaching staff that are not licensed or screened properly in violation of state laws, NMAA regulations, and EPS policies.

147. Defendants EPS and Martinez have a policy and/or custom of failing to supervise and train coaching staff to adequately deal with students with medical conditions.

148. Defendants EPS and Martinez have a policy and/or custom of failing to supervise and train coaching staff to adequately deal with students with medical conditions.

149. Defendants EPS and Martinez have a policy and/or custom of failing to supervise and train their coaching staff when they are found to have violated state laws, NMAA regulations, and/or EPS policies.

150. Defendants EPS and Martinez have a policy and/or custom of retaliating against students who report misconduct. This is evidenced by the fact that Defendants Dominguez and Trujillo were never disciplined and continue to be coaches at EVHS.

151. Defendants EPS and Martinez created a custom and/or policy by allowing

Defendants Dominguez and Trujillo to violate multiple state laws, NMAA regulations, and EPS policies.

152. Defendants EPS and Martinez created a custom and/or policy by violating multiple state laws, NMAA regulations, and EPS policies.

153. Defendants conduct as alleged herein, violated Luke's First Amendment rights, specifically the right to free speech in public places, and express and/or file grievances, causing the resulting injuries and damages set forth herein.

154. The conduct of all Defendants, as alleged herein, was motivated by Plaintiffs conduct.

155. The conduct of all Defendants, as alleged herein, was a direct and proximate cause of injuries and damage to Luke.

156. Defendants acted willfully, knowingly, and purposefully or with deliberate indifference to deprive Luke of his clearly established First Amendment rights.

157. The conduct of all Defendant was intentional, unreasonable, reckless, wanton, willful, and callously indifferent to the rights of Luke.

158. Plaintiffs seek a declaration that Defendants violated his First Amendment rights by retaliating against him, as well as damages.

**COUNT II**
**NMCRA CLAIM**
**AGAINST DEFENDANT EPS**
**VIOLATION OF N.M. CONST. ART. II, SEC. 17**
**(RETALIATION)**

159. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

160. Plaintiff's constitutional rights under Article II, Section 17 of the New Mexico Constitution are afforded greater protection than his rights under the United States Constitution.

161. As a result of Plaintiffs reporting that Defendant Dominguez was not licensed at the time, all Defendants retaliated against Plaintiff by demoting him, expelling him from the team, and forcing Luke to transfer schools.

162. Defendants conduct as alleged herein, violated Luke's constitutional rights, specifically the right to free speech in public places, causing the resulting injuries and damages set forth herein.

163. The conduct of all Defendants, as alleged herein, was motivated by Plaintiffs conduct.

164. The conduct of all Defendants, as alleged herein, was a direct and proximate cause of injuries and damage to Luke.

165. All Defendants acted willfully, knowingly, and purposefully or with deliberate indifference to deprive Luke of his constitutional rights.

166. The conduct of all Defendants was intentional, unreasonable, reckless, wanton, willful, and callously indifferent to the rights of Luke.

167. Plaintiffs seek a declaration that Defendants violated his constitutional rights by retaliating against him, as well as damages.

168. Defendant EPS is liable under the NMCRA.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment on their behalf and against Defendants:

A. Declaratory relief;

B. Judgment against Defendants;

C. Compensatory damages;

D. Pre-judgment interest;

E. Post-judgment interest;

F. Plaintiffs' costs;

G. Punitive damages;

H. Past and future pain, suffering, and mental anguish;

I. Reasonable attorney's fees and costs; and

J. Such other and further relief as the Court deems just.

DATED: April 15, 2024                                   Respectfully submitted,

                                                        */s/ Ramón A. Soto*

                                                        Ramón A. Soto
                                                        **THE SOTO LAW OFFICE, LLC**
                                                        300 Central Ave. SW
                                                        Suite 2500W
                                                        Albuquerque, New Mexico 87102
                                                        Office: (505) 273-4062
                                                        Fax: (505) 494-1092
                                                        ramon@thesotolawofficellc.com

                                                        *Attorney for Plaintiffs*