**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

LUKE ARCHULETA,

Plaintiff,

v.

Case No. 1:24-cv-00359-MIS-JHR

BOARD OF EDUCATION FOR ESPAÑOLA PUBLIC SCHOOLS; FILIBERTO "FIL" DOMINGUEZ; JOEY TRUJILLO; and HOLLY MARTINEZ,

Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court on Defendants Board of Education for Española Public Schools ("Board"), Filiberto "Fil" Dominguez, and Joey Trujillo's (collectively, "Defendants") Motion for Summary Judgment ("Motion"), ECF No. 49, filed December 19, 2025. Plaintiff Luke Archuleta ("Plaintiff") filed a Response to the Motion on January 16, 2026 ("Response"), ECF No. 52, to which Defendants filed a Reply on January 30, 2026 ("Reply"), ECF No. 56. Upon review of the Parties' submissions, the record, and the relevant law, the Court will **GRANT IN PART AND DENY IN PART** the Motion.

## I. Introduction[1]

At the time of the incidents giving rise to the Complaint, Plaintiff was a sixteen-year-old high school student who attended Española Valley High School ("EVHS"). Compl. ¶ 29, ECF No. 1. The Complaint alleges that Plaintiff was a star athlete, competing on the school's varsity basketball and football teams while he attended EVHS. *Id.* ¶¶ 30-31. It also alleges that he was an

[1] Unless otherwise noted, the information contained in this section is gleaned from the Complaint and is included solely to frame the issues raised by the Motion.

exceptional student with aspirations of attending the United States Military Academy at West Point. *Id*. ¶ 30, 32. Plaintiff believes that he "very likely could have obtained a recommendation from our United States Senators or Congresspeople to be admitted into West Point." *Id*.

According to Plaintiff, this all changed when Defendant Trujillo was hired as the head coach of the EVHS boys' varsity basketball team, and Defendant Dominguez was hired as one of his assistant coaches in the spring of 2022, even though Dominguez was not properly licensed as a coach until July 1, 2022. *Id.* ¶¶ 34-36. Plaintiff and his parents reported several times to Defendant Martinez—who was then Superintendent for Española Public Schools—that Dominguez was not licensed prior to July 1, 2022. *Id.* ¶ 42.

During the summer leading into his junior year, Plaintiff alleges that he and his parents clashed with Trujillo and Dominguez. *Id.* ¶¶ 44-100. During one incident at a basketball tournament in Santa Fe (the "Santa Fe tournament"), Dominguez allegedly "forcefully placed his hands upon Luke and struck him in the head to the point his head snapped back." *Id.* ¶ 52. Plaintiff later reported this incident to administrators. *Id.* ¶ 57. In October 2022, Plaintiff's doctor provided a note to Defendants stating that Luke suffered from anxiety, panic attacks, and depression as a result of Defendants' conduct toward him. *Id.* ¶ 121. According to the Complaint, Plaintiff was ultimately "cut from the basketball team altogether by Defendant Dominguez and Defendant Trujillo in further retaliation against [Plaintiff], which here done [sic] with the intent to injure [Plaintiff] by depriving him of participation in the basketball program and forcing a transfer to a school in a different town." *Id*. ¶ 125.

On April 15, 2024, Plaintiff filed this civil rights action against the Board, Dominguez, Trujillo, and Martinez.[2] ECF No. 1. In Count I, Plaintiff alleges all Defendants retaliated against

---

[2] This case was originally assigned to United States Magistrate Judge Kirtan Khalsa on consent, ECF No. 2, and then reassigned to the undersigned United States District Judge on August 5, 2026, ECF No. 63.

him for exercising his right to the freedom of speech under the First Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, *id.* ¶¶ 142-58—and specifically, by "reporting that Defendant Dominguez was not licensed at the relevant times[,]" *id.* ¶ 143; by "reporting that Defendant Dominguez assaulted and battered [Plaintiff] in violation of policies and regulations[,]" *id.* ¶ 144; and by "reporting that [Plaintiff] was diagnosed with a medical condition because of Defendant Dominguez's assault and battery upon [Plaintiff][,]" *id.* ¶ 145. In Count II, Plaintiff alleges that the Board retaliated against him for exercising his right to the freedom of speech under Article II, Section 17 of the New Mexico Constitution, pursuant to the New Mexico Civil Rights Act ("NMCRA"). *Id.* ¶¶ 159-68.

On June 14, 2024, Defendants filed a Motion to Dismiss and for Qualified Immunity. ECF No. 8. On March 31, 2025, the Court entered an order granting in part and denying in part Defendants' Motion to Dismiss. ECF No. 25. The Court determined that Plaintiff sufficiently alleged a First Amendment relation claim against Dominguez and Trujillo in their individual capacities, *id*. at 12, and that Dominguez and Trujillo were not entitled to the defense of qualified immunity at that stage of the proceedings, *id*. at 15. However, the Court found that Plaintiff did not sufficiently allege a First Amendment retaliation claim against Martinez, *id.* at 17, and did not sufficiently allege a First Amendment retaliation claim against the Board based on a theory of municipal liability, *id.* at 17-29. Finally, the Court found that the Complaint sufficiently alleged a retaliation claim under the NMCRA against the Board. *Id.* at 29-31.

On December 19, 2025, Defendants filed the instant Motion for Summary Judgment. ECF No. 49. Plaintiff filed a Response, ECF No. 52, to which Defendants filed a Reply, ECF No. 56.

## II. Evidentiary disputes

Before reciting the material facts for purposes of resolving the Motion, it is necessary to first resolve some of the disputes between the Parties concerning what evidence the Court may properly consider at the summary judgment stage. In his Response to the Motion, Plaintiff asserts that the Court should not consider certain portions of an investigation report drafted by Michael Carrico, an outside contractor hired by Martinez. ECF No. 52 at 4 n.1. Specifically, Plaintiff objects to the Court considering evaluative opinions, conclusions, credibility determinations, and embedded witness statements because he claims that "Defendants have not shown that those materials can be presented in admissible form at trial or that a hearsay exception applies." *Id*. However, Plaintiff argues that the Court may consider factual findings and evaluative conclusions contained in the Carrico investigation report because "such findings are presumptively admissible under Federal Rule of Evidence 803(8) absent a showing of untrustworthiness." *Id.* at 6-7 n.2.

While the form of evidence presented at the summary stage need not be admissible at trial, "the *content or substance* of the evidence must be admissible." *Johnson v. Weld County*, 594 F.3d 1202, 1210 (10th Cir. 2010) (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)). For example, "Rule 56 permits parties at summary judgment to produce their evidence by means of affidavit, a *form* of evidence that is usually inadmissible at trial given our adversarial system's preference for live testimony." *Id*. However, Rule 56 does not give courts license to relax the content or substance of the Federal Rules of Evidence when reviewing an affidavit on a motion for summary judgment. *Id*. "[T]he rule does nothing to intimate 'hearsay testimony that would be inadmissible at trial' somehow becomes admissible simply by being 'included in an affidavit to defeat summary judgment.'" *Id*. (quoting *Thomas*, 48 F.3d at 485). Therefore, "although evidence presented in the form of an affidavit at summary judgment can be 'converted' in form into live

testimony at trial, the content or substance of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration." *Id*.

Regarding the Carrico investigation report, in its current *form*, the Court concludes it would likely not be admissible at trial. The Federal Rules of Evidence provide that a record or statement of a public office may be admissible if it sets out, "in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii) & (B). Despite the Rule's plain language, "Supreme Court of the United States precedent indicates that rule 803(8)'s reference to factual findings includes both facts and opinions." *United States v. DeLeon*, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988)). "Under this rule, a proponent of a document must show that the document (1) was prepared by a public office; and (2) set out information as specified in the rule." *Cooper v. Meritor, Inc.*, 363 F. Supp. 3d 695, 698 (N.D. Miss. 2019) (citation modified).

Here, the Carrico investigation report was not created *by* a public office, but rather *for* a public office. However, the Fifth Circuit has twice admitted reports under Rule 803(8) that were not prepared *by* a public office. *See United States v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984) (finding admissible under Rule 803(8) a cargo survey report prepared by an independent surveyor); *United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 626-27 (5th Cir. 1992) (finding admissible under Rule 803(8) survey reports and quarantine certificates prepared by independent surveyors under the factual findings provision of the rule). As one court has noted, "[f]rom the results of these decisions, it can be fairly presumed that a non-governmental report is public when

the person preparing the report (1) personally observed the matters set forth in the report; and (2) had a duty to report the matters to a public official." *Cooper*, 363 F. Supp. 3d at 699.

However, this test "does not cover the vast majority of investigative reports, which as the name indicates, embody the results of investigation and accordingly are often not the product of the declarant's firsthand knowledge, required under most hearsay exceptions." *Id.* (citation modified). Therefore, an investigative report not prepared *by* a public office should be admissible under Rule 803(8) "only when it has been prepared by the equivalent of government investigators." *Id*. at 700 (quotation marks and citation omitted). In turn, this standard can be met "when a public agency closely manages the relevant investigation." *Id*.

While Martinez hired Carrico to conduct an investigation, *see* ECF No. 49-2 at 2, no evidence has been presented on whether she "closely managed" his investigation. Accordingly, in its current *form*, Carrico's investigation report is likely inadmissible. *See Johnson v. City of Fort Worth*, 565 F. Supp. 3d 817, 825 n.4 (N.D. Tex. 2021) (concluding investigation report was inadmissible under Rule 803(8), in part, because there were no indications that the public office closely managed any portion of the privately prepared investigation report).

However, as has been noted, evidence is not required to be in admissible form at the summary stage; instead, only the content and substance of the evidence must be potentially admissible at trial. *See Johnson*, 594 F.3d at 1210; *see also Calhoun v. McHugh*, 2 F. Supp. 3d 1217, 1227 (N.D. Ala. 2014) ("At this stage, it may consider any evidence that *could be* presented in a form admissible at trial." (emphasis in original)). Here, the Court concludes that, at a minimum, the factual findings of the Carrico investigation report could be presented in an admissible form at trial, such as through live testimony by Carrico. *See Ames v. Bonneville Joint Sch. Dist. No. 93*, Case No. 4:22-cv-00364-DKG, 2024 WL 4368139, at *7 (D. Idaho Oct. 1, 2024)

(finding that the court could consider a Title IX investigation report on a motion for summary judgment because its content could be presented in an admissible form, such as through live testimony from the author of the report); *see also In re SDG&E Consol. Cases*, Case No. 17-cv-02433-BAS-JLB, 2021 WL 662259, at *5 (S.D. Cal. Feb. 19, 2021) ("SDG&E does not argue that the author of the report cannot be called to testify at trial or that the contents of the document cannot be presented in a form that would be admissible at trial."). However, the Court will not consider any statements or summaries from witness interviews contained in the report that were made or obtained from individuals who are not parties to this case, as such statements and summaries would be hearsay, "beyond the bounds of the court's consideration." *Johnson*, 594 F.3d at 1210; *see also Jessup v. Miami-Dade County*, 697 F. Supp. 2d 1312, 1322 (S.D. Fla. 2010) ("[W]hile 'factual findings' in internal affairs reports are generally admissible under an exception to the hearsay rule, Fed. R. Evid. 803(8), summaries of interviews that are contained in those reports are also double hearsay that cannot be admitted at trial or considered on summary judgment.").[3]

The Carrico investigation report is not the only subject of dispute regarding what evidence the Court may consider in resolving the Motion. In his Response to the Motion, Plaintiff included an additional undisputed material fact that Trujillo called him a liar in "connection with the family's complaints." ECF No. 52 at 16. Normally, this fact would be permissible for the Court to consider, as the Court's Local Rules permit a party responding to a motion for summary judgment to "set forth additional facts other than those which respond to the Memorandum which the non-

[3] However, the Court finds that it can consider statements and summaries of witness interviews of individuals who are parties to this case, as such statements and summaries could be produced in an admissible form through live testimony from Carrico as a statement of a party opponent, which is specifically excluded from the rule against hearsay. *See* Fed. R. Evid. 801(d)(2)(A) (providing that a statement offered against an opposing party and that "was made by the party in an individual or representative capacity" is not hearsay).

movant contends are material to the resolution of the motion." D.N.M.LR-Civ. 56.1(b). However, Defendants appear to challenge this fact as "hearsay within hearsay." Reply at 5. Despite this challenge by Defendants, the Court concludes that it may consider this fact because it is supported by evidence that can be produced in an admissible form at trial.

In her deposition, Plaintiffs' mother, Tina Archuleta, testified that Trujillo called Plaintiff a liar and expressed full faith in his assistant coaches. Tr. of Tina Archuleta Dep. at 10:15-18, ECF No. 52-5. This assertion could be offered through Tina's live testimony at trial, and it would not be inadmissible hearsay for two reasons. First, an alleged statement that Trujillo called Plaintiff a liar would be admissible as a party-opponent's statement—a specific exclusion to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(A). Second, even if it was hearsay, the statement would not be offered for the truth of the matter asserted in the statement. That is, Tina testifying at trial that Trujillo called Plaintiff a liar is not offered to prove that Plaintiff is indeed liar. Instead, it is being offered to establish that Trujillo *called* Plaintiff a liar and would therefore be admissible. This logic was persuasively explained by one federal court as follows:

> For example, if Heverly offered testimony that Lewis told Heverly that the Management Group called Heverly a liar, it would be offered to prove the truth of the matter: that the Management Group *told Lewis* that Heverly was a liar. On the other hand, if Lewis himself were to offer such testimony, the matter asserted would not be that the Management Group told Lewis something, but that Heverly is a liar. In that case, it would not be hearsay, as defamation is concerned with the words said, not their truth, and that testimony would not be offered to prove that Heverly is a liar.

*Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, No. 09-CV-99-JPS, 2011 WL 4478440, at *12 (E.D. Wis. Sep. 23, 2011) (emphasis in original). Accordingly, the Court will consider this fact for purposes of resolving the Motion because the Court finds it is predicated on evidence that could be offered in an admissible form at trial.

Having resolved these evidentiary disputes, the Court proceeds to recite the material facts.

## III. Material Facts[4]

Unless otherwise noted, the following facts are undisputed. Plaintiff is the son of Ruben Archuleta ("Ruben") and Tina Archuleta ("Tina"). Defs.' Facts ¶ 2. At the time of the events giving rise to this case, Plaintiff was a student at EVHS who played basketball on the junior varsity and varsity teams during his sophomore year. Id. ¶ 1. Throughout the Complaint, Plaintiff refers to himself as a "star athlete" and "one of the best athletes" in the EVHS basketball program; and states that due to his exceptional . . . athleticism and acumen, [he] planned on applying to the United States Military Academy West Point." *Id.* ¶ 9 (quoting Compl. ¶¶ 30-32). During the relevant period, Defendant Joey Trujillo ("Coach Trujillo") was the Head Varsity Basketball Coach for EVHS, *id.* ¶ 5; Defendant Filberto "Fil" Dominguez ("Coach Dominguez") was an assistant athletic coach for EVHS, *id.* ¶ 4; Matthew Abeyta ("AD Abeyta") was the Athletic Director for Española Public Schools ("EPS"), id. ¶ 6; Michael Chavez was the principal of EVHS, *id.* ¶ 7; and

---

[4] The following facts are gleaned from Defendants' Undisputed Material Facts ("Defs.' Facts"), ECF No. 49 at 3-9; Plaintiff's Responses to Defendants' Undisputed Material Facts ("Pl.'s Resp. Facts"), ECF No. 52 at 4-16; and Plaintiff's Additional Undisputed Material Facts ("Pl.'s Add'l Facts"), id. at 16-18.

In his Response, Plaintiff purports to dispute, or dispute in part, some of the Defendants' Facts, but the Court finds that most of the purported disputes are not genuine. For example, Defendants' Fact number 16 states: "When Mr. Lopez was unable to finish the investigation, Mr. Abeyta was assigned to complete the investigation of the allegations brought forth by Mr. Ruben Archuleta." Defs.' Facts ¶ 16. Plaintiff's Response states: "Dispute in part; meeting included hostile comments (calling [Plaintiff] a liar) and rejection of the complaints." Pl.'s Resp. Facts ¶ 16. Plaintiff's response and his citations to the record do not controvert Defendants' statement of fact.

As another example, Defendants' Fact number 18 states: "Defendant Dominguez admitted to cussing during a tournament basketball game, stating, "we need to 'move the f---ing ball' but that was directed toward the entire team, not Plaintiff or any other individual student." Defs.' Facts ¶ 18. Plaintiff's Response states: "Dispute. Plaintiff's evidence supports that profanity/intimidation occurred and was reported; [Plaintiff] adopted his mother's written complaint as accurate." Pl.'s Resp. Facts ¶ 18. Plaintiff's response to Fact 18 and his citations to the record do not controvert Defendants' statement of fact.

As a third example, Defendants' Fact number 6 states: "At the time of the allegations underlying the Complaint, Matthew Abeyta was the Athletic Director for EPS." Defs.' Facts ¶ 6. Plaintiff's Response states: "Admit in part; dispute the implication that Luke was never competing for varsity opportunities or that later actions were unrelated to the complaints." Pl.'s Resp. Facts ¶ 6. Plaintiff's response and his citations to the record do not controvert Defendants' statement of fact.

Under the Local Rules of this District, all material facts in a motion for summary judgment "will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b). The Court finds that Plaintiff specifically controverted Defendants' Facts numbered 11, 28, and 29 *only*, Resp. at 8, 14-15; the Court deems the rest of Defendants' Facts to be undisputed pursuant to Local Rule 56.1(b).

former Defendant Holly Martinez ("Superintendent Martinez") was the Superintendent for EPS, *id.* ¶ 3.

On June 3-5, 2022, Plaintiff participated in an offseason basketball tournament in Santa Fe with his team and new coaches (Trujillo and Dominguez). *Id.* ¶ 8; Abeyta Aff. ¶ 3, ECF No. 49-5 (indicating that the tournament was in Santa Fe). During one of the games, Coach Dominguez told Plaintiff to go play with the junior varsity team in order to get more playing time. Defs.' Facts ¶ 10. Tina approached Coach Dominguez during the tournament to ask why he had sent Plaintiff to play junior varsity and inquired about his attitude. *Id.*

On June 22, 2022, Plaintiff attended an offseason practice and scrimmage and "during that time he and another teammate became engaged in a verbal argument," which culminated in Plaintiff pushing a freshman basketball player to the ground. *Id.* ¶ 11. Coach Trujillo told Plaintiff to calm down and that he would not be playing in the scrimmage for his actions. *Id.* When Coach Dominguez went to check on Plaintiff he was in the hallway visibly upset and pumping his fists. *Id.* When Coach Dominguez told Plaintiff to calm down, Plaintiff told Coach Dominguez something to the effect of "you poked me in the head." *Id.* Coach Dominguez was taken aback and walked away after becoming nervous due to Plaintiff continuing to pump his fists. *Id.* The Parties dispute whether Coach Trujillo called Plaintiff a "liar" when Tina confronted Coach Trujillo about this situation. Pl.'s Add'l Facts ¶ 1; Reply at 5.

On July 8, 2022, Ruben Archuleta met with Superintendent Martinez to lodge a complaint on behalf of Luke against Coach Dominguez, "stating that Coach Dominguez cussed at his son during the June 3-5 basketball tournament and poked Luke in the forehead aggressively." Defs.' Facts 12 (quoting Aff. of Holly Martinez ¶ 3, ECF No. 49-2). On July 9, 2022, Superintendent

Martinez directed Christian Lopez, EPS Safety & Security Director, to begin an investigation of Ruben's allegations. *Id.* ¶ 13.

On July 12, 2022, Tina Archuleta sent Superintendent Martinez an email requesting a meeting with her and others, including Christian Lopez and AD Abeyta, and stated that the forehead poke incident constituted abuse against her son. *Id.* ¶ 14.

On July 19, 2022, Lopez and AD Abeyta met with Plaintiff and his parents to discuss the allegations brought forward by Ruben on July 8, 2022, and by Tina on July 12, 2022. *Id.* ¶ 15. This is the first time Plaintiff advised EPS administration of the allegations of profanity and the alleged forehead poke. *Id.*

On September 9, 2022, Tina reported to Superintendent Martinez that Coach Dominguez mocked Luke after a football game, and that she believed the conduct was retaliatory. Pl.'s Add'l Facts ¶ 4. However, Defendants dispute that this situation occurred. Reply at 6.

On October 6, 2022, Tina sent Superintendent Martinez a doctor's note dated October 5, 2022, and signed by Dr. Amelia B. Kreienkamp, stating that Plaintiff "is demonstrating signs of physical and emotional stress following a bullying incident on the basketball team with apparent retaliation from the coaches[,]" with some general suggestions to "have a third party present at basketball practice" and that "[b]asketball is important to Luke and he should be allowed to continue on the basketball team." Defs.' Facts ¶ 23 (quoting Doctor's Note, ECF No. 49-15 at 4). AD Abeyta, Lopez, Coach Dominguez, and Coach Trujillo never saw a doctor's note for Plaintiff alleging a medical or mental disability. *Id.* ¶ 24. Coach Dominguez and Coach Truillo were not aware of Plaintiff's diagnosis of panic attacks and anxiety. *Id.* ¶ 25.

On November 14, 2022, Plaintiff attended the EVHS routine basketball tryouts. *Id.* ¶ 26.

Forty-seven (47) players participated in the tryouts. Id. Plaintiff was not selected to be a member of the varsity or junior varsity boys' basketball team. *Id.*

The Parties dispute why Plaintiff was not selected for a team. Defendants assert that Plaintiff's scores during the basketball tryouts were not stellar, and that his being cut from the team had as much to do with his attitude and disrespectful behavior towards Coach Trujillo, Plaintiff's teammates, and other coaches as his ability to play basketball. *Id.* ¶ 28 (citations omitted). Defendants state that Plaintiff was, at best, an average basketball player, but he probably would have made the team, although not likely as a starter, with the right behavior. *Id.* ¶ 29. Coach Dominguez recused himself from scoring Plaintiff in an effort to address any alleged bias against Plaintiff. *Id.* Coaches Trujillo and Montaño scored Plaintiff in approximately the lowest 15% of the players trying out with average on passing, rebounding, and most defensive skills, and below average on footwork, handles, shooting, communication, intangibles, commitment, integrity, humility and improvement. *Id.*

Plaintiff, on the other hand, states that he "performed as expected and had a great performance." *Id.* ¶ 27 (quoting Compl. ¶ 124). Plaintiff testified at his deposition that he believes he wasn't selected for either team because he reported the coaches' conduct to administrators. Tr. of Luke Archuleta Dep. at 46:21 – 47:2, ECF No. 52-4. Plaintiff also testified that during basketball practice, which was held before an athletics class during the school day, the coaches "purposely separated" him from the basketball team by having him practice with "the lowest group." *Id*. at 47:11-23.

Throughout the fall 2022 semester, Plaintiff continued to attend EVHS and receive good grades. Defs.' Facts ¶ 30. Thereafter, Plaintiff transferred to Los Alamos High School because he wanted to play basketball and because it is one of the top schools in the country. *Id.* ¶ 31. EPS

did not contest Plaintiff's request to transfer schools, which was approved by the New Mexico Activities Association ("NMAA"). *Id.* ¶ 32. Plaintiff played basketball at Los Alamos High School his junior and senior year. *Id.* ¶ 33.

When Lopez was unable to finish his investigation, AD Abeyta was assigned to complete the investigation of the allegations brought forward by Ruben. *Id.* ¶ 16. AD Abeyta interviewed all parties involved, including Ruben and Tina, Coach Dominguez, other students who participated in the Santa Fe basketball tournament in June, Plaintiff and – at Ruben's request – the Taos Head Boys Basketball coach, Hernando Chavez. *Id.* ¶ 17. Coach Dominguez admitted to cussing during a tournament basketball game, stating, "we need to 'move the f---ing ball,'" but it was directed toward the entire team, not Plaintiff or any other individual student. *Id.* ¶ 18. AD Abeyta's investigation "could not substantiate the allegations brought forth by the Archuletas." *Id.* ¶ 19.

Because the Archuletas were not satisfied with AD Abeyta's investigation, Superintendent Martinez hired an outside contractor, Michael Carrico, to conduct a second investigation into the Archuletas' allegations. *Id.* ¶ 20. Mr. Carrico interviewed all parties involved, including Ruben and Tina, Mr. Lopez, Middle School Head Coach Mike Jaramillo, Assistant High School Basketball Coach Randy Montaño, and one student witness. *Id.* ¶ 21. Because the Archuletas had raised a concern that student witnesses may have been reluctant to come forward with adverse information during the school's initial investigation, Mr. Carrico prepared an anonymous questionnaire, which was completed by twenty players. *Id.* None of the players reported seeing Coach Dominguez swear at or poke Plaintiff. *Id.* Mr. Carrico also determined that the November 2022 basketball team tryouts did not violate the NMAA rules. *Id.* Ultimately, Mr. Carrico determined that AD Abeyta's handling of the incident was appropriate and he concurred with AD

Abeyta's initial investigation that the evidence was inconclusive as no one saw Coach Dominguez poke Plaintiff in the forehead. *Id.* ¶ 22.

## IV. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to point the court to record evidence of facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id.* at 248. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the nonmovant must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)).

It is not the court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627

(10th Cir. 2012), *abrogated on other grounds by Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Rather, the court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## V. Discussion

Defendants argue that Coach Dominguez and Coach Trujillo are entitled to summary judgment on Plaintiff's First Amendment retaliation claims because, in their view, they "did not retaliate against Plaintiff, nor did they force him to transfer schools." Mot. at 2. Additionally, Defendants contend that Coach Dominguez and Coach Trujillo are entitled to qualified immunity because Plaintiff cannot demonstrate that their actions "violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendants' allegedly unlawful conduct." *Id.* at 15 (quoting *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007) (citation modified)). Defendants further argue that the Court lacks jurisdiction over Plaintiff's retaliation claim against the Board under the NMCRA because "[c]laims under the New Mexico Civil Rights Act must first be filed in New Mexico state court." *Id.* (quoting *Peña Lee v. City of Las Cruces*, 794 F. Supp. 3d 1058, 1092 (D.N.M. 2025)). Accordingly, Defendants argue this claim must be dismissed "because the only proper forum is within the state district courts of New Mexico." *Id*. at 16. Alternatively, Defendants argue that the Board is entitled to summary judgment on Plaintiff's NMCRA retaliation claim because Plaintiff "has not adduced any facts to

support his allegations" that Coaches Dominguez and Trujillo demoted or expelled him from the EVHS basketball team. *Id*.

**a. Plaintiff's First Amendment Retaliation Claims Against Dominguez and Trujillo**

In his Complaint, Plaintiff alleges that Coaches Trujillo and Dominguez retaliated against him by "demoting him from the basketball program, expelling him from the team, and forcing [him] to transfer schools." ECF No. 1 ¶¶ 142-58. More specifically, Plaintiff alleges that he was retaliated against by Coaches Dominguez and Trujillo for (1) reporting that Coach Dominguez "was not licensed at the relevant times"; (2) reporting that Coach Dominguez "assaulted and battered [him] in violation of policies and regulations"; and (3) "reporting that [he] was diagnosed with a medical condition because of [Coach] Dominguez's assault and battery upon [him] in violation of policies and regulations." *Id*. ¶¶ 143-45.

To establish a First Amendment retaliation claim, a plaintiff must show "(1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Irizarry v. Yehia*, 38 F.4th 1282, 1288 (10th Cir. 2022) (alteration in original) (quoting *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).

In the context of speech by school students, such as in this case, "it is clear that students have First Amendment rights—they do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *McLaughlin v. Bd. of Regents of Univ. of Okla.*, 566 F. Supp. 3d 1204, 1213 (W.D. Okla. 2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). However, "the constitutional rights of students in public school are not

automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). For example, the Supreme Court has

> [O]utlined three specific categories of student speech that schools may regulate in certain circumstances: (1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper.

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187-88 (2021) (citation modified).[5] Additionally, schools have "a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id*. at 188 (citation omitted). However, "extensive case law" supports "the proposition that school authorities may not penalize students for their speech when that speech is nondisruptive, non-obscene, and not-school sponsored." *Seamons v. Snow*, 206 F.3d 1021, 1030 (10th Cir. 2000) ("*Seamons II"*).

As to the second element of a First Amendment retaliation claim, that a plaintiff suffered an injury that would chill a person of ordinary firmness from continuing to engage in protected speech, the injury "need not be particularly great in order to find that rights have been violated." *Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976) (plurality opinion). In this context, an injury is an "adverse consequence that the plaintiff suffers at the hands of the defendant." *Irizarry*, 38 F.4th at 1288 n.6. Despite an injury not needing to be particularly great, "a trivial or de minimis injury will

[5] To expand on the third category of student speech that schools may regulate in certain circumstances, the Supreme Court in *Hazelwood School District v. Kuhlmeier* stated that schools have greater authority to regulate student speech in "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. 260, 271 (1988). The Supreme Court reasoned that such activities "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants or audiences." *Id*. However, the Tenth Circuit has clarified that the *Hazelwood* analysis is inapplicable where, as here, "the expression at issue [] is private student speech and not school-sponsored speech." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35 (10th Cir. 2013).

not support a retaliatory [speech] claim." *Eaton v. Meneley*, 379 F.3d 949, 955 (10th Cir. 2004) (citation omitted).

The third element of a First Amendment retaliation claim—that an adverse action taken by a defendant be substantially motivated as a response to constitutionally protected speech—may be demonstrated through either direct or circumstantial evidence. *Collopy v. City of Hobbs*, 27 F. App'x 980, 986 (10th Cir. 2001). "To establish a causal connection exists, a plaintiff may offer evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Walton v. N.M. State Land Off.*, 113 F. Supp. 3d 1178, 1190 (D.N.M. 2015) (quotation marks omitted). The Tenth Circuit has recognized that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Butler v. City of Prairie Village*, 172 F.3d 736, 752 (10th Cir. 1999) (quoting *Marx v. Schnuck Mkts., Inc*., 76 F.3d 324, 329 (10th Cir. 1996)). However, "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014). Moreover, "[e]vidence such as a long delay between the [student's] speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link." *Sinfuego v. Curry Cnty. Bd. of Cnty. Comm'rs*, 360 F. Supp. 3d 1177, 1254 (D.N.M. 2018) (internal citations omitted) (quoting *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005)).

### 1. Plaintiff's First Amendment Retaliation Claim Against Dominguez

#### A. Whether Plaintiff Was Engaged in Constitutionally Protected Activity

As previously noted, Plaintiff alleges that Dominguez retaliated against him in response to him (1) reporting licensure concerns about Coach Dominguez; (2) reporting that Coach Domiguez

assaulted and battered him; and (3) reporting that he was diagnosed with a medical condition because of Coach Dominguez's alleged assault and battery. Compl. ¶¶ 143-45.

In their Motion, Defendants essentially concede that Plaintiff has satisfied the first element of a First Amendment retaliation claim—that is, that he was engaged in constitutionally protected activity. ECF No. 49 at 12-13. However, Defendants contend that "Plaintiff's only alleged protected activity is when he himself complained of the events that occurred during the June 3-5, 2022 basketball tournament on July 19, 2022." *Id.* at 12. The Court agrees.

As an initial matter, there is sufficient evidence from which a rational jury could conclude that Plaintiff personally reported allegations concerning Coach Dominguez's conduct during the Santa Fe basketball tournament to school officials. For example, AD Abeyta's investigation report, which Defendants attached to their Motion, demonstrates that Plaintiff personally reported to AD Abeyta and Lopez allegations that Dominguez cursed at him and poked him in the forehead during a game at the Santa Fe tournament. ECF No. 49-11 at 4. Additionally, Plaintiff testified in his deposition that he "reported the incidents to them—to them, as a school." Tr. of Luke Archuleta Dep. at 46:21-2, ECF No. 52-4. While it is not clear what "incidents" Plaintiff was referring to in his deposition testimony, on a motion for summary judgment, the Court is to draw all reasonable inferences from the record evidence in favor of the nonmoving party. *See Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (noting that on a motion for summary judgment, the district "will draw all reasonable inferences in favor of the nonmoving party."). When Plaintiff's deposition testimony is considered with AD Abeyta's investigation report, a rational jury could reasonably infer that Plaintiff reported allegations concerning Coach Dominguez's conduct during the Santa Fe tournament to school officials.

Moreover, Plaintiff attached a Declaration to his Response to the Motion in which he attested that "Coach Filiberto Dominguez used profanity during a game and I reported that he poked me in the forehead in an aggressive manner." Luke Archuleta Decl. ¶ 3, ECF No. 52-1. This bolsters the conclusion that a jury could reasonably find that Plaintiff personally reported to school officials allegations concerning Coach Dominguez's conduct during the Santa Fe tournament. Furthermore, it is undisputed that Plaintiff personally accused Coach Dominguez of poking him in the forehead on June 22, 2022, during a basketball scrimmage held at EVHS. Defs.' Facts ¶ 11; Pl.'s Resp. Facts ¶ 11; see also Tr. of Dominguez Dep. at 56:12 – 57:14, ECF No. 49-8 at 3. A student reporting alleged verbal and physically abusive behavior by or to a school official is speech that is protected by the First Amendment. *See Seamons v. Snow*, 84 F.3d 1226, 1237-38 (10th Cir. 1996) ("*Seamons I*") (concluding that a student's report to school officials of a physical assault by his teammates was protected by the First Amendment because such speech was not disruptive of classwork, invasive of the rights of other students, and not part of a school-sponsored activity); *see also Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 768 (9th Cir. 2006) (concluding that high school basketball players' petition and reports to school officials about the verbally abusive and intimidating behavior of their coach was protected speech under the First Amendment because such speech "neither disrupted school activities nor impinged on the rights of other students."). Accordingly, the Court concludes that a rational jury could find that Plaintiff was engaged in constitutionally protected activity by reporting Coach Dominguez's alleged conduct during the Santa Fe tournament to school officials.

Plaintiff also asserts that he was engaged in constitutionally protected activity by reporting concerns over Dominguez's coaching license. Resp. at 19-20. This could be protected speech under the First Amendment. *See Seamons I*, 84 F.3d at 1237-38. However, as Defendants point

out, there is very little evidence suggesting that Plaintiff ever personally reported concerns to school officials about Coach Dominguez's coaching licensure.

For example, the Carrico investigation report also notes that the "Archuletas assert Coach Dominguez and Coach Trujillo were allowed to participate in summer basketball, without a background check." ECF No. 52-8 at 5. While a jury could reasonably infer that the "Archuletas" includes Plaintiff, the Court finds such evidence does not support a reasonable inference that Plaintiff personally reported concerns over Coach Dominguez's coaching licensure for two reasons. First, at the beginning of the investigation report, Carrico wrote that he was retained by EPS to "investigate complaints asserted by parents Ruben Archuleta and Tina Archuleta on behalf of their son. . . ." ECF No. 49-14 at 1. This undermines any inference that Plaintiff personally reported such concerns to school officials. Second, a concern over a background check is distinct from a concern over a coach's licensure. A background check for a coach could potentially contain information on the coach's licensure to coach, but no evidence has been presented that would permit a reasonable inference that a background check would include such information.

The Carrico investigation report also includes a section discussing Dominguez and Trujillo's coaching licenses. ECF No. 52-8 at 5-6. From such evidence, one could reasonably infer that someone reported concerns over Dominguez's and Trujillo's coaching licenses. However, given that Carrico was retained by EPS to investigate complaints "asserted by Ruben Archuleta and Tina Archuleta on behalf of their son," ECF No. 49-14 at 1, it is unreasonable to infer that Plaintiff personally reported concerns over Dominguez's and Trujillo's coaching licenses.

And while Plaintiff testified in his deposition that he "reported incidents" to school officials, it is unclear whether this testimony refers to concerns with Coach Dominguez's coaching licensure. Tr. of Luke Archuleta Dep. at 46:21-22, ECF No. 52-4. Indeed, whether Coach

Dominguez was properly licensed to coach cannot fairly be described as an "incident." Although the Court must draw all reasonable inferences in favor of the nonmoving party at the summary judgment stage, it may not draw inferences that are not supported by the record. *See Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017). Here, without other evidence suggesting that Plaintiff personally reported concerns over Coach Dominguez's coaching licensure, the Court finds it is unreasonable to infer from Plaintiff's deposition testimony that he personally reported concerns over Coach Dominguez's coaching licensure. *See Thomas v. Hansen*, No. 2:12-cv-701-DN-EJF, 2013 WL 4590634, at *2 (D. Utah Aug. 28, 2013) ("The Plaintiff must have more than a scintilla of evidence in support of its position such that a 'jury could reasonably find for the Plaintiff.'" (citation omitted)).

Although there is evidence from which a jury could reasonably conclude that *Ruben* reported concerns over Coach Dominguez's licensure, *see* Ruben Archuleta's Decl. ¶¶ 5-6, ECF No. 52-3, this does not help Plaintiff establish that *Plaintiff* was engaged in constitutionally protected speech, and a plaintiff asserting a First Amendment retaliation claim must base such a claim on his own speech. *See Fogarty v. Boles*, 121 F.3d 886, 891 (3rd Cir. 1997) ("[T]he absence of speech—in fact, its explicit disclaimer by plaintiff—is fatal to the plaintiff's claim."); *see also Walker v. Town of Hennessey*, 951 F. Supp. 2d 1263, 1272 (W.D. Okla. 2013) ("Plaintiff's retaliation claim fails insofar as he relies on his perceived reporting of the masturbation incident to demonstrate a constitutional violation, as there was no speech by him."); *Whalen v. Selk*, 24-cv-342-jdp, 2025 WL 2374447, at *5 (W.D. Wis. Aug. 14, 2025) ("The parties agree that a plaintiff can assert a First Amendment claim about his own speech only. . . .").[6] Accordingly, the Court

[6] Within the last decade, the Sixth Circuit has indicated that a plaintiff can maintain a First Amendment retaliation claim based on the speech of others with whom he is associated. *See Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 514 (6th Cir. 2017) (permitting a plaintiff to maintain a First Amendment retaliation claim based on speech made by the plaintiff's niece.). However, the Sixth Circuit's test for First Amendment

concludes that Plaintiff has not established that he was engaged in constitutionally protected activity by reporting concerns about Dominguez's coaching license because he has not presented evidence from which a rational jury could find that he personally made such reports.

Plaintiff also alleges in his Complaint that he was retaliated against by Coach Dominguez as a result of him and his parents reporting to school officials that he was diagnosed with a medical condition following the alleged incident with Coach Dominguez at the Santa Fe tournament. ECF No. 1 ¶ 145. However, there is little evidence in the record suggesting that Plaintiff ever personally reported that he was diagnosed with a medical condition. While Plaintiff testified in his deposition that he reported "incidents" to school officials, the Court finds that this testimony, without more, is insufficient for a jury to reasonably infer that Plaintiff personally reported to school officials

---

retaliation claims is slightly different than the one formulated by the Tenth Circuit. According to the Sixth Circuit's test, "[t]o state a First Amendment retaliation claim, the plaintiff must show: (1) *that the speech* was protected by the First Amendment; (2) she suffered an adverse [] action; and (3) the adverse action was motivated at least in part in response to the exercise of her constitutional rights." *Id*. at 513 (emphasis added).

In contrast, under the Tenth Circuit's test for First Amendment retaliation claims—which this Court must apply—a plaintiff must show that "(1) *she* was engaged in constitutionally protected activity (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity; and (3) the defendant's actions were substantially motivated as a response to her protected conduct." *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (emphasis added) (quotation marks and brackets omitted); *see also Irizarry*, 38 F.4th at 1288 ("To state a First Amendment retaliation claim, a plaintiff must allege facts showing '(1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'") (alteration in original) (quoting *Worrell*, 219 F.3d at 1212). Consistent with this Tenth Circuit precedent, the Court finds that a plaintiff must base a First Amendment retaliation claim on his own speech.

Additionally, the Court recognizes that one federal district court has permitted a high school athlete to bring a First Amendment retaliation claim based off speech his parents made. *See Cain v. Tigard-Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120, 1126-27 (D. Or. 2003) (permitting a high school football player to maintain a First Amendment retaliation claim for complaints his parents made against a high school football coach). In doing so, the court in *Cain* reasoned that the high school athlete's parents' speech implicated his right to freely associate. *See id.* at 1127 ("The First Amendment protects not only a citizen's right to speak freely but also his or her right to associate freely with other speakers of similar opinions."). Moreover, the court in *Cain* seemingly found it significant that the high school athlete alleged in his complaint that he "adopted and authorized his parents to attempt to protect him from the abusive conduct by raising the complaints." *Id*. The Court finds the instant case is distinguishable from *Cain*. While the right to freedom of association is encompassed by right to freedom of speech, *see McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021), unlike in *Cain*, Plaintiff's Complaint does not contain any allegations that he authorized his parents' speech or adopted their speech as his own. Instead, Plaintiff's theory of retaliation has seemingly always been predicated on *his* speech, not the speech of persons he associates with. Furthermore, *Cain* is not binding precedent on the Court, and it is inconsistent with the Tenth Circuit's test for First Amendment retaliation claims.

that he was diagnosed with a medical condition. And the Court is not at liberty to draw inferences that are unsupported by record. *See Est. of Redd.*, 848 F.3d at 906. Indeed, being diagnosed with a medical condition cannot fairly be described as an "incident."

Although there is evidence in the record from which a jury could reasonably conclude that Tina reported that Plaintiff was suffering adverse health effects following the alleged incident with Coach Dominguez at the Santa Fe tournament, *see* Doctor's Note, ECF No. 49-15 at 4; Martinez Aff. ¶ 14, ECF No. 49-2; Tr. of Tina Archuleta Dep. at 26:12, ECF No. 52-5, Plaintiff may not maintain a First Amendment retaliation claim based on the speech of his mother.[7] *See Fogarty*, 121 F.3d at 891; *see also Whalen*, 2025 WL 2374447, at *5. Accordingly, the Court concludes that Plaintiff has not presented sufficient evidence from which a rational jury could find that he personally reported to school officials that he was diagnosed with a medical condition. *See* Tr. of Dominguez Dep. at 95:24 – 99:5, ECF No. 49-8; Tr. of Trujillo Dep. at 48:19 – 49:22, 53:20 – 54:24, ECF No. 49-16.

In sum, the Court concludes Plaintiff has established that he was engaged in only one form of constitutionally protected activity—that is, he personally reported to school officials allegations concerning Coach Dominguez's conduct during the Santa Fe tournament. To the extent Plaintiff attempts to sustain a First Amendment retaliation claim based on assertions that he reported (1) concerns about Dominguez's coaching license and (2) that he was diagnosed with medical condition, the Court concludes such theories fail due to a lack of evidence from which a jury could reasonably find that Plaintiff engaged in such speech.

---

[7] And even if Plaintiff could assert a derivative retaliation claim, there is no evidence that Coach Dominguez was aware of the doctor's note, or was otherwise aware Plaintiff suffered from any medical condition, such that he could be held liable for retaliation on these grounds. *See* Dominguez Aff. ¶ 12 ("At no time did I receive a note from Luke Archuleta's doctor regarding any alleged disability or mental condition."); Tr. of Dominguez Dep. at 96:24 – 99-5, ECF No. 49-8.

**B. Whether Plaintiff Suffered an Injury that Would Chill a Person of Ordinary Firmness from Continuing to Engage in Protected Activity**

In his Complaint, Plaintiff asserts that he suffered the following injuries as a result of Coach Dominguez's retaliation: (1) he was demoted from the basketball program; (2) he was expelled from the basketball team; and (3) he was forced to transfer schools. ECF No. 1 ¶¶ 143-45. In their Motion, Defendants argue that Plaintiff has adduced no evidence to establish that he suffered an injury that would chill a person of ordinary firmness from continuing to engage in constitutionally protected speech. ECF No. 49 at 13. First, they argue that Plaintiff's contention that he was demoted from the basketball program is without merit, as they note that he "played on both EVHS's junior varsity and varsity teams during his sophomore year, and he was not selected to play for either team his junior year." *Id.* Defendants similarly suggest that Plaintiff's claim that he was "expelled" from the EVHS basketball program is also without merit. *Id*. Lastly, Defendants argue that Plaintiff has not established that he was "forced" to transfer to a different school. *Id*. at 12. However, the Court concludes that Plaintiff has presented sufficient evidence from which a jury could reasonably conclude that he suffered at least one injury that would chill a person of ordinary firmness.

As an initial matter, the Court agrees with Defendants that Plaintiff has not presented sufficient evidence that would permit a rational jury to conclude that he was "forced" to transfer schools. During his deposition, Plaintiff testified that he transferred to Los Alamos High School

> [f]or their renowned education. Los Alamos is, from what I've heard, one of the top schools in the nation. It's one of the best public schools. They have great teachers, great funding. Like you [sic] said before, you know, I have a lot of—I had—I had wanted to go to West Point. I had a lot of interest in going to school at West Point. So I went—pretty much, basically, I went there for my education prowess.

Tr. of Luke Archuleta Dep. at 53:11-17, ECF No. 52-4. According to Plaintiff, he discussed the decision of whether to transfer to a different school with his parents but admitted that it was "pretty

much my idea." *Id.* at 53:23-24. None of this evidence reasonably suggests that Plaintiff was "forced" to transfer schools for not being selected for a spot on either the junior varsity or varsity basketball team at EVHS. At this time, Plaintiff has only produced allegations contained in his Complaint that he was "forced" to transfer schools. This is insufficient to withstand a motion for summary judgment. *See Johnson*, 422 F.3d at 1187 (stating that the nonmoving party must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment").

However, the Court disagrees with Defendants' argument that Plaintiff has not adduced any evidence to establish that he suffered an injury that would chill a person of ordinary firmness from continuing to engage in constitutionally protected activity. In making this argument, Defendants parrot the language used in Plaintiff's Complaint, arguing that Plaintiff was not "demoted" from the varsity basketball team because he played on both the junior varsity and varsity team during his sophomore year. Mot. at 2. Additionally, they assert Plaintiff was not "expelled" from the varsity team, but rather "he did not earn a spot on the team in November of 2022, mostly due to his behavior." *Id.* at 12. The Court finds Defendants' argument on this point to be too literalist and myopic.

While Plaintiff uses the phrases "demoted" and "expelled" in his Complaint to describe not being selected for either the junior varsity or varsity basketball team, it is clear from his Complaint that one of the injuries he allegedly suffered was not being selected for a spot on either team. For example, Plaintiff alleged in his Complaint that he "was cut from the basketball team altogether by Defendant Dominguez and Defendant Trujillo in further retaliation against [him], which were [sic] done with the intent to injure [Plaintiff] by depriving him of participation in the basketball program and forcing a transfer to a school in a different town." ECF No. 1 ¶ 125. Defendants'

fixation on Plaintiff's use of the words "demoted" and "expelled" to describe his injury in failing to be selected for a spot on either the junior varsity or varsity basketball team focuses too much on the form rather than the substance of his Complaint.

Moreover, it is undisputed that Plaintiff failed to make either the junior varsity or varsity basketball team following the November 2022 tryouts. Defs.' Facts ¶¶ 28-29; Pl.'s Resp. Facts ¶¶ 28-29; Luke Archuleta Decl. ¶ 5, ECF No. 52-1. A rational jury could conclude that Plaintiff, by not being selected for a spot on either team, suffered an injury that would chill a person of ordinary firmness from continuing to engage in protected speech. *See Seamons I*, 84 F.3d at 1238 (concluding a high school football player stated a First Amendment retaliation claim by alleging that he was dismissed from the football team due to his constitutionally protected speech); *see also Pinard*, 467 F.3d at 771 ("[T]he defendants' suspension of the plaintiffs would lead ordinary student athletes in the plaintiffs' position to refrain from complaining about an abusive coach in order to remain on the team."); *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534, 540 (6th Cir. 2003) (concluding high school athletes had suffered an injury that would chill a person of ordinary firmness when they "were denied the opportunity to play high school basketball.").

In sum, the Court concludes that Plaintiff has not presented sufficient evidence from which a reasonable jury could conclude that he was "forced" to transfer schools. However, Plaintiff has presented sufficient evidence that would permit a rational jury to find that he suffered an injury that would chill a person of ordinary firmness by not being selected for a spot on either the junior varsity or varsity basketball team.

**C. Whether the Adverse Action Was Substantially Motivated as a Response to Plaintiff's Constitutionally Protected Conduct**

Defendants also argue that Plaintiff has not produced evidence that establishes that the alleged adverse action taken against him was substantially motivated as a response to his exercise

of constitutionally protected speech. Mot. at 13. Defendants contend that Plaintiff was not selected for a spot on either the junior varsity or varsity basketball team for a nonretaliatory reason, arguing "the primary reason Plaintiff did not make the EVHS basketball team in November of 2022 was due to his own behavior—his attitude and disrespectful behavior towards his teammates and coaches." *Id*. at 14. Additionally, Defendants argue that Coach Dominguez did not retaliate against Plaintiff during the basketball tryouts because he recused himself from scoring Plaintiff to avoid any impression of bias. *Id*. The Court agrees with Defendants that Plaintiff has not presented sufficient evidence from which a reasonable jury could find that Coach Dominguez's alleged actions were substantially motivated as a response to Plaintiff's exercise of constitutionally protected speech.

As a starting point, the Court notes that it has already determined that Plaintiff has only produced sufficient evidence from which a jury could find that he was engaged in constitutionally protected speech when he reported to school officials allegations about Coach Dominguez's conduct during the Santa Fe tournament. *See supra* Section V(a)(1). Serious allegations of misconduct against a defendant may support an inference that a defendant took an adverse action against a plaintiff and that such adverse action was substantially motivated by the plaintiff's exercise of constitutionally protected speech. *See Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005) ("[W]e have considered as relevant whether the protected speech implicated the individual defendant in wrongdoing."). Additionally, there is sufficient evidence in the record from which a jury could conclude that Coach Dominguez was aware that Plaintiff reported allegations about his conduct during the Santa Fe tournament to school officials. Abeyta Aff. ¶¶ 10-11, ECF No. 49-5; Tr. of Dominguez Dep. at 56:12 – 57:14, ECF No. 49-8. Evidence that a defendant has knowledge of the protected speech may also support an inference that the defendant's subsequent conduct was

substantially motivated as a response to the constitutionally protected speech. *Maestas*, 416 F.3d at 1189 (noting that a defendant's knowledge of protected speech, together with close temporal proximity to the adverse action, may support an inference that the adverse action was substantially motivated by the speech).

Despite such evidence, the Court concludes that a reasonable jury could not find that Coach Dominguez's alleged adverse conduct was substantially motivated as a response to Plaintiff's protected speech for two reasons. First, the Court finds that the temporal proximity between Plaintiff's protected speech and the adverse action seriously undermines any inference that Dominguez's alleged adverse conduct was substantially motivated as a response to Plaintiff's protected speech. It is undisputed that Plaintiff personally accused Coach Dominguez of misconduct during a scrimmage held at EVHS on June 22, 2022. Defs.' Facts ¶ 11; Pl.'s Resp. Facts ¶ 11. The Court finds that this is the earliest moment that a jury could reasonably find that Plaintiff was engaged in constitutionally protected speech, as a student reporting abusive behavior by or to a school official is constitutionally protected speech. *See Seamons I*, 84 F.3d at 1237-38; *see also Pinard*, 467 F.3d at 768. Furthermore, it is undisputed that Plaintiff reported allegations about Coach Dominguez's conduct to school officials during a meeting with Lopez and Abeyta on July 19, 2022. Defs.' Facts ¶ 15; Pl.'s Resp. Facts ¶ 15.

However, the Court observes that whether a hypothetical jury concludes that Plaintiff first engaged in protected speech on June 22, 2022, or July 19, 2022, is immaterial because in either case, the adverse action—Plaintiff not being selected for either the junior varsity or varsity basketball team—would have occurred more than three months *after* Plaintiff's protected speech. It is undisputed that the basketball tryouts were held on November 14-15, 2022. Defs.' Facts ¶ 26; Pl.'s Resp. Facts ¶ 26; *see also* Trujillo Aff. ¶ 6, ECF No. 49-4. And it was only *after* the basketball

tryouts that Plaintiff was not selected for either the junior varsity or varsity team. Evidence of a significant delay between the protected speech and the adverse action undermines an inference that the adverse action was substantially motivated as a response to the protected speech. *See Sinfuego*, 360 F. Supp. 3d at 1254. More importantly, standing alone, a delay of over three months between the protected speech and the adverse action cannot support an inference that the adverse action was substantially motivated as a response to the protected speech. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (observing in an ADA retaliation case that "we have held that a three-month period, standing alone, is insufficient to establish causation.") (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (involving an FLSA retaliation claim)); *see also Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected [] activity and the alleged act of retaliation.").

Second, it is undisputed that Coach Dominguez recused himself from scoring Plaintiff during the basketball tryouts in an effort to avoid an impression of bias. Defs.' Facts ¶ 26; Pl.'s Resp. Facts ¶ 26; Dominguez Aff. ¶ 11, ECF No. 49-3. The Court finds this fact significant because it undermines any inference that Coach Dominguez was personally involved in the adverse action of not selecting Plaintiff for a spot on either team. The Tenth Circuit has noted that "if the defendant's conduct did not cause the adverse action, then the defendant may successfully defend the retaliation claim." *Trant*, 754 F.3d at 1170 (quoting *Worrell*, 219 F.3d at 1212). Plaintiff has not offered any evidence explaining *how* Dominguez personally contributed to the adverse action.

In his Response, Plaintiff claims that there are "disputed facts about differential treatment during the tryout process itself, including [Plaintiff's] testimony that coaches segregated him into the lowest group." Resp. at 20. In his deposition, Plaintiff testified that

> I think—I think coach—I think the coaches have, themself [sic]—separate myself—they separate themself [sic]—separate me from the team. The practice—there's practice before we have basketball class—basketball in the morning. He would put me with the—the lowest group I can possibly be with. He purposely separates me from the team.

Tr. of Luke Archuleta Dep. at 47:11-17, ECF No. 52-4. Differential treatment can support an inference of retaliation. *See Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 289 (E.D.N.Y. 2012) ("While evidence of differential treatment can support a claim of First Amendment retaliation, such differential treatment alone is insufficient.") (internal citation omitted). However, when read in context, it is clear that Plaintiff was referring to a basketball practice, not the tryouts. As AD Abeyta explained during his deposition, EVHS has "an athletics class for both boys and girls basketball," which is open to "any student who wants to register for it." Tr. of Abeyta Dep. at 41:15-22, ECF No. 49-9. Additionally, while Plaintiff initially referred to the basketball coaches collectively, he then testified that "he," without identifying who "he" is, purposely separated him from the team. From his limited testimony, it would not be reasonable for a jury to infer that Plaintiff was referring to Coach Dominguez. Moreover, even assuming that Plaintiff was referring to Coach Dominguez, it is undisputed that Coach Dominguez was not involved in scoring Plaintiff during the tryouts, which undermines any inference that Dominguez contributed to the decision to not select Plaintiff for either the junior varsity or varsity team.

In his Response, Plaintiff also argues that Coach Dominguez's alleged mocking of him after a football game in September 2022 supports "a reasonable inference that hostility toward the protected complaints persisted after the initial investigations." ECF No. 52 at 21. The Court notes there is a genuine factual dispute regarding whether such an incident occurred. Defendants have presented evidence suggesting that such an incident never occurred. *See* Letter from Joey Trujillo to Holly Martinez (Sep. 12, 2022), ECF No. 56-3 at 2. However, Plaintiff testified in his deposition

that after the football game, Coach Dominguez was "kind of trying to tell me something" and that it wasn't "anything good; I know it wasn't positive." Tr. of Luke Archuleta Dep. at 43:2-4, ECF No. 49-7. At summary judgment, it is not the Court's role to weigh the evidence and make credibility assessments of witnesses. *See Duran v. United Tactical Sys., LLC*, 586 F. Supp. 3d 1106, 1112 (D.N.M. 2022) ("It is not the Court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment."). These functions are within the exclusive province of a jury.

If Plaintiff's version of events is credited by a jury, evidence of antagonistic comments made by a defendant after a plaintiff's protected speech can support an inference of retaliation. *See Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 555 (E.D. Pa. 2013) (noting that a plaintiff can establish that his protected speech was a substantial factor for the alleged adverse action by presenting evidence of "a pattern of antagonism coupled with timing to establish a causal link." (citation omitted)). However, even assuming Coach Dominguez did make antagonistic comments to Plaintiff after a football game in September 2022, any inference of retaliation is severely weakened by the undisputed fact that Dominguez did not participate in scoring Plaintiff during the basketball tryouts nearly two months later. *See Trant*, 754 F.3d at 1170. Additionally, it is not apparent what connection, if any, Dominguez's alleged comments after the football game have to the adverse action of Plaintiff not being selected for a spot on either the junior varsity or varsity basketball team. More evidence is needed to draw the inference that such alleged comments were in any way tied to the adverse action, and Plaintiff has not provided such evidence.

Accordingly, the Court finds that Plaintiff has not presented sufficient evidence from which a reasonable jury could conclude that the adverse action allegedly taken by Coach Dominguez was substantially motivated as a response to Plaintiff's constitutionally protected speech. Because

Plaintiff has not presented sufficient evidence to establish each element of his First Amendment retaliation claim, Coach Dominguez is entitled to summary judgment on this claim.

### 2. Plaintiff's First Amendment Retaliation Claim Against Trujillo

#### A. Whether Plaintiff Was Engaged in Constitutionally Protected Activity

The Court's analysis regarding whether Plaintiff was engaged in constitutionally protected activity for his First Amendment retaliation claim against Coach Dominguez is equally applicable to his First Amendment retaliation claim against Coach Trujillo. *See supra* Section V(a)(1)(A). Plaintiff has produced sufficient evidence from which a rational jury could conclude that he personally reported to school officials allegations about Coach Dominguez's conduct during the Santa Fe basketball tournament. Accordingly, a rational jury could find that Plaintiff engaged in one form of constitutionally protected activity. *See Seamons I*, 84 F.3d at 1237-38; *see also Pinard*, 467 F.3d at 768.

#### B. Whether Plaintiff Suffered an Injury that Would Chill a Person of Ordinary Firmness from Continuing to Engage in Protected Activity

Similarly, the Court's analysis of whether Plaintiff suffered an injury that would chill a person or ordinary firmness from continuing to engage in protected activity for his First Amendment retaliation claim against Coach Dominguez is equally applicable to his First Amendment retaliation claim against Trujillo. *See supra* Section V(a)(1)(B). Plaintiff has presented sufficient evidence from which a jury could reasonably conclude that he suffered an injury that would chill a person of ordinary firmness from continuing to engage in protected activity by not being selected for a spot on either the junior varsity or varsity basketball team. *See Seamons I*, 84 F.3d at 1238; *see also Pinard*, 467 F.3d at 771; *Henley*, 84 F.App'x at 540; *Whalen*, 2025 WL 2374447, at *5.

### C. Whether the Adverse Action Was Substantially Motivated as a Response to Plaintiff's Constitutionally Protected Conduct

However, the evidence of whether the adverse action was substantially motivated as a response to Plaintiff's constitutionally protected activity is different for Plaintiff's First Amendment retaliation claim against Coach Trujillo. Unlike with Coach Dominguez, there is no undisputed fact that Coach Trujillo recused himself from scoring Plaintiff during the November 2022 basketball tryouts, a fact that seriously undermines any inference that Coach Dominguez contributed to the adverse action of not selecting Plaintiff for a spot on either the junior varsity or varsity basketball team. Therefore, the Court finds it necessary to conduct a deeper analysis on this element of Plaintiff's First Amendment retaliation claim against Coach Trujillo.

In arguing that Plaintiff has not produced sufficient evidence that the adverse action was substantially motivated as a response to Plaintiff's exercise of constitutionally protected speech, Defendants argue that it was Plaintiff's performance "during tryouts and his attitude and disrespectful behavior towards his coaches and teammates that resulted in him not being selected for the EVHS basketball team in November of 2022, not government action." Mot. at 14. Defendants add that Coach Trujillo did not retaliate against Plaintiff at the basketball tryouts and that he was "not selected for the team for legitimate reasons." *Id*. Ultimately, the Court finds sufficient evidence has been presented from which a jury could rationally conclude that the alleged adverse action Plaintiff suffered was substantially motivated, at least as to Coach Trujillo, as a response to Plaintiff's exercise of constitutionally protected speech.

As an initial matter, the Court acknowledges that the delay between Plaintiff's protected speech and the adverse action weakens an inference of retaliation by Coach Trujillo. *See Sinfuego*, 360 F. Supp. 3d at 1254. And where, as here, as much as three months elapse between the protected activity and the adverse action, a jury cannot reasonably infer from the temporal proximity alone

that the adverse action was substantially motivated as a response to Plaintiff's protected speech. *See Anderson*, 181 F.3d at 1179; *see also Nicastro*, 60 F. Supp. 2d at 185.

However, temporal proximity is not the only way a Plaintiff can establish that an adverse action was substantially motivated as a response to a plaintiff's protected speech. For example, a retaliatory motive can be demonstrated circumstantially through statements or actions indicating retaliatory animus. *See Brandon v. Kinter*, 938 F.3d 21, 41 (2nd Cir. 2019) ("Significantly, [Plaintiff] does not rely exclusively on temporal proximity to establish causation. Additionally, he attests that [the defendants] made statements indicating retaliatory animus."); *see also Alers*, 919 F. Supp. 2d at 555 (noting that retaliation can be evidenced through a pattern of antagonistic conduct). Moreover, the absence of close temporal proximity between the protected speech and the adverse action does not invariably lead to summary judgment in favor of the defendant. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) ("[T]he length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment."). To enforce such a rigid rule ignores the reality that

> [r]etaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation.

*Id.*

Here, sufficient evidence has been produced from which a reasonable jury could infer that the adverse action was substantially motivated as a response to Plaintiff's protected speech. For example, there is evidence that suggests Coach Trujillo was aware that Plaintiff reported allegations about Coach Dominguez's conduct to school officials. In his deposition, Trujillo testified that he first learned of Plaintiff's allegations against Dominguez "during the summer, and

we were having a scrimmage." Tr. of Trujillo Dep. at 32:21-22, ECF No. 56-5. Additionally, Coach Dominguez testified in his deposition that he told Coach Trujillo about Plaintiff's allegations during the June 22, 2022 scrimmage. Tr. of Dominguez Dep. at 57:9-14, ECF No. 49-8. A defendant's awareness of protected speech can support an inference of retaliation. *See Maestas*, 416 F.3d at 1189 (noting that awareness by a defendant of protected speech can support an inference of retaliation).

Additionally, there has been evidence presented that suggests Coach Trujillo was bothered by Plaintiff's protected speech. For example, in an email Coach Trujillo sent to Superintendent Martinez on September 12, 2022, which is a message regarding the alleged incident between Plaintiff and Coach Dominguez after the football game, he wrote, "[t]his is the Archuleta's [sic] 2nd time to accuse Coach Dominguez of doing something to [Plaintiff]. I feel that the Archuletas are targeting Coach Dominguez. I feel that this is very unfair to Coach Dominguez." Letter from Joey Trujillo to Holly Martinez (Sep. 12, 2022), ECF No. 56-3 at 2.[8] Additionally, in her deposition, Tina testified that Coach Trujillo called Plaintiff a liar after he was informed of Plaintiff's allegations against Dominguez. Tr. of Tina Archuleta Dep. at 10:15-18, ECF No. 52-5. From this evidence, a jury could reasonably infer that Coach Trujillo was bothered by Plaintiff's speech, and such evidence can support an inference of retaliation. *See Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (noting that evidence that a defendant expresses opposition to a plaintiff's protected speech can support an inference of retaliatory motive).

---

[8] The Court notes that Defendants attached this email to their reply in support of the Motion. The Court finds that it may consider this email for purposes of resolving the Motion because it believes its content could be produced in an admissible form at trial, such as through live testimony from Coach Trujillo. *See In re TK Boat Rentals, LLC*, 411 F. Supp. 3d 351, 374 (E.D. La. 2019) (determining that emails could be considered on summary judgment motion because "the content of the emails may be presented at trial by the testimony of their authors").

Plaintiff has also produced evidence that suggests Coach Trujillo was involved in singling out Plaintiff for differential treatment following his protected speech. Evidence of differential treatment after a plaintiff's protected speech supports an inference of retaliation. *See Monz*, 853 F. Supp. 2d at 289; *see also Whalen*, 2025 WL 2374447, at *9 (finding that evidence a coach singled out student athlete for adverse treatment, without explanation, was circumstantial evidence that supported an inference of retaliation). In his deposition, Plaintiff testified that during basketball practice prior to EVHS's athletics class, the coaches purposely separated him from the basketball team by putting him with "the lowest group I can possibly be with." Tr. of Luke Archuleta Dep. at 47:11-16, ECF No. 52-4. Plaintiff also testified that he was the "the only returning varsity player," and yet he was sent to practice with the "second-string C team." *Id.* at 35:5-11. This evidence supports an inference of retaliation. *See Whalen*, 2025 WL 2374447, at *9 (finding that a coach making only one senior high school basketball player practice with the freshman could be reasonably explained as the coach being upset with the student athlete's speech).

While this testimony by itself may not be sufficient to support an inference that Coach Trujillo was personally involved in separating Plaintiff from the team during the basketball practice, there is other evidence from which a jury can reasonably infer that Coach Trujillo was, at least to some extent, involved in such an action. For example, during his deposition, Coach Trujillo indicated he was involved with the basketball practices held before the athletics class. Tr. of Trujillo Dep. at 37:6-23, ECF No. 49-16. Furthermore, by virtue of Coach Trujillo's status as head boys' varsity basketball coach, a jury could reasonably infer that he had some personal involvement in determining practice decisions regarding players within the basketball program. When coupled with Plaintiff's deposition testimony, a jury could reasonably infer from this

evidence that Coach Trujillo was involved in isolating Plaintiff from the basketball team during the EVHS basketball class.

The Court also finds that Plaintiff has produced sufficient evidence from which a jury could reasonably infer that Coach Trujillo's explanation for why Plaintiff did not earn a spot on either the junior varsity or varsity team was pretextual, a factor that can support an inference of retaliatory motive. *Cf. Montgomery v. City of Ardmore*, 365 F.3d 926, 939 (10th Cir. 2004) (affirming summary judgment on First Amendment retaliation claim where plaintiff offered no evidence that reasons given for adverse action were pretextual); *see also Alers*, 919 F. Supp. 2d at 548 (noting that a plaintiff may raise an inference of retaliation through "evidence of the defendant's inconsistent explanation of its actions, i.e., that its explanation is pretextual" (citation omitted)); *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 562 (S.D.N.Y. 2010) (noting that "a jury may infer retaliatory intent from evidence" that a defendant's stated reasons for adverse action were pretextual). Defendants contend that Plaintiff was not selected for a spot on either the junior varsity or varsity team because of his performance during the basketball tryouts, his attitude, and disrespect towards his teammates and coaches. Mot. at 14. In an affidavit, Coach Trujillo asserted that, "[a]lthough [Plaintiff's] scores during the boys' basketball tryouts were not stellar, his being cut from the team had more to do with [his] attitude and disrespectful behavior towards me, his teammates and other coaches than his ability to play basketball." Trujillo Aff. ¶ 7, ECF No. 49-4. In his deposition, Coach Trujillo repeated a similar sentiment. Tr. of Trujillo Dep. at 36:9-12, ECF No. 49-16. Trujillo added that Plaintiff "would have probably made the team" with the "right behavior towards me." *Id*. at 36:20-21.

To establish that a defendant's reasons for an adverse action are pretextual, a plaintiff may present evidence that a defendant's explanations are "so incoherent, weak, inconsistent, or

contradictory that a rational factfinder could conclude they are unworthy of belief." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017) (citation omitted). While Trujillo indicated that Plaintiff's performance during the tryouts was not great by referencing Plaintiff's less than stellar scores, Plaintiff has presented evidence that creates a genuine dispute of material fact on this point. In his deposition, Plaintiff testified that he had a great performance during the basketball tryouts. Tr. of Luke Archuleta Dep. at 43:23 – 44:16, ECF No. 49-7. According to Plaintiff, he scored a lot of points, "was getting a lot of rebounds," and was coming in first "when it comes to conditioning drills." *Id.* at 44:3-6. In a Declaration, Plaintiff also attested that he believed he "performed well at tryouts." Luke Archuleta Decl. ¶ 5, ECF No. 52-1. At this stage, it is not the Court's role to make credibility assessments or weigh the evidence. *See Robison*, 821 F.2d at 924. Those decisions should be left to the jury, and from the evidence Plaintiff has presented, a jury could reasonably find that he performed well during the basketball tryouts.

Coach Trujillo also indicated that Plaintiff was not selected for a spot on either team due, in part, to his attitude and disrespect towards the basketball coaches. For example, in an affidavit, Coach Trujillo asserted that Plaintiff "always talked back to the coaches and stopped listening to the instructions given by the boys basketball coaches." Trujillo Aff. ¶ 4, ECF No. 49-4. Coach Dominguez also testified in his deposition that he told Tina that Plaintiff's attitude was "not the best" he had experienced as a coach. Tr. of Dominguez Dep. at 54:13, ECF No. 49-8. However, in his deposition, Plaintiff testified that he "never had any complaints, from any coaches, involving not being coachable." Tr. of Archuleta Dep. at 47:20-22, ECF No. 52-4. The Court finds this evidence creates a genuine issue of material fact concerning Plaintiff's attitude and disposition towards his coaches because being "coachable" commonly refers to an athlete's attitude and willingness to accept instruction. *See How to be Coachable and Why Coachability Matters*, NCSA

College Recruiting, https://www.ncsasports.org/recruiting/how-to-get-recruited/coachable. (last visited Aug. 17, 2026) ("Coachability refers to an athlete's attitude. A coachable athlete is one who openly and humbly listens to honest feedback and willingly applies that feedback to improve their athletic development."). If a jury were to credit Plaintiff's testimony, it could reasonably conclude that Plaintiff did not have issues with his attitude and disposition towards his coaches, casting doubt on Coach Trujillo's explanation.

Additionally, Coach Trujillo asserted that Plaintiff was not selected for a spot on either team because he was disrespectful towards his teammates. It is undisputed that Plaintiff was involved in an altercation with a younger basketball player in the EVHS program during a scrimmage at the school on June 22, 2022. Defs.' Facts ¶ 11; Pl.'s Resp. Facts ¶ 11. A jury could reasonably conclude from this undisputed fact that Plaintiff may not have always been an exemplary teammate. However, the Court notes that Coach Trujillo *did not* refer to this incident, either in his affidavit or deposition testimony, as an of example of Plaintiff's alleged disrespectful behavior towards his teammates. More importantly, Plaintiff testified in his deposition that he generally had a good relationship with his teammates, explaining that "[w]e have—we had—we've had arguments, and, you know—like stuff like that, where it's just, you know, like little—little—you know, things that teammates go through, but—I mean, for the most part, it was all pretty good, most of which I still talk to today." Tr. of Luke Archuleta Dep. at 17:1-5, ECF No. 52-4. Plaintiff added that he got along "fine" with his teammates during basketball practice. *Id*. at 47:18. If a jury were to credit Plaintiff's testimony, it could reasonably conclude that Plaintiff generally had good relationships with his teammates, thereby undermining Coach Trujillo's assertion that there were legitimate concerns over his behavior towards his teammates.

With the evidence presented, the Court concludes that a reasonable jury could find that Coach Trujillo retaliated against Plaintiff for engaging in constitutionally protected speech.

**b. Qualified Immunity on Plaintiff's First Amendment Retaliation Claim**

In addition to arguing that they are entitled to summary judgment on the merits of Plaintiff's First Amendment retaliation claims, Coaches Dominguez and Trujillo contend that they are also entitled to qualified immunity on such claims. Mot. at 15. Defendants assert that Plaintiff cannot meet his "heavy two-part burden" of showing that Dominguez's and Trujillo's actions (1) violated a statutory or constitutional right; and (2) that the right was clearly established at the time of their allegedly unlawful conduct. *Id*. (quoting *Casey*, 473 F.3d at 1327). Because the Court has already determined that Coach Dominguez is entitled to summary judgment on Plaintiff's First Amendment retaliation claim against him, the qualified immunity analysis applies only to Coach Trujillo.

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation modified). "In a defendant's assertion of a defense of qualified immunity, the burden shifts to the plaintiff to show: (1) a violation of a constitutional right, and (2) that the right was clearly established." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). The burden on a plaintiff in this context has been described as "a heavy two-part burden." *Allbright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). "If the plaintiff fails to satisfy either part of the two-part inquiry, the Court must grant the defendant qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

With respect to the first prong of the qualified immunity analysis—in the context of summary judgment—a court must view the issue "through the prism of our summary judgment standard and thus examined in the light most favorable to the plaintiff[.]" *Van Deelen v. Johnson*, 497 F.3d 1151, 1158 (10th Cir. 2007). In other words, when the issue is raised at summary judgment, the inquiry is whether a plaintiff has presented sufficient evidence from which a reasonable jury could conclude that a violation of a constitutional right occurred. *Id*.

As to the second prong—that the right violated was clearly established—a court asks "whether 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Est. of Booker*, 745 F.3d at 411 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id*. (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008)). "Precedent need not be directly on point so long as it places the statutory or constitutional question beyond debate." *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) (quotation marks and citation omitted). However, the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (ellipses omitted) (quoting *al-Kidd*, 563 U.S. at 742). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id*. (quotation marks and citation omitted).

A district court may decide which prong to address first in light of the circumstances of a particular case. *Ortiz v. Mora*, 426 F. Supp. 3d 924, 933 (D.N.M. 2019). "If the plaintiff makes the required two-fold showing, the public official then bears the usual summary judgment movant's

burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Hinton v. City of Elwood*, 997 F.2d 774, 779 (10th Cir. 1993).

**1. Whether a Constitutional Right Was Violated**

With respect to the first prong, the Court has already found that Plaintiff has presented sufficient evidence from which a reasonable jury could find that his First Amendment rights were violated by Coach Trujillo. *See supra* Section V(a)(2). In short, Plaintiff has presented evidence from which a jury could find that (1) he engaged in constitutionally protected speech; (2) he suffered an injury that would chill a person of ordinary firmness from continuing to engage in constitutionally protected speech; and (3) that Coach Trujillo's actions were substantially motivated as a response to his exercise of constitutionally protected speech. *See id.*

**2. Whether the Constitutional Right Was Clearly Established**

As to the second prong, the Court finds that the law was clearly established that a high school athlete may not be denied participation on a school sports team because of their speech, such that "it is well developed enough to inform the reasonable official that his conduct violates that law." *Seamons I*, 84 F.3d at 1238 (quoting *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992)).

As has been noted, to be clearly established, there must generally be a Tenth Circuit or Supreme Court decision on point. *Est. of Booker*, 745 F.3d at 411. In *Seamons I,* on review of a district court's grant of a motion to dismiss, the Tenth Circuit considered whether school officials, including a high school football coach, were entitled to qualified immunity on a First Amendment retaliation claim. 84 F.3d at 1237-38. In that case, a high school football player alleged that he was dismissed from the football team in response to him reporting an assault he experienced that was perpetrated by his teammates. *Id*. at 1230. In determining that the school officials were not entitled

to qualified immunity at the motion to dismiss stage, the Tenth Circuit first concluded that the football player's speech was protected by the First Amendment because it was

> responsibly tailored to the audience of school administrators, coaches, family and participants who needed to know about the incident. [Plaintiff's] behavior neither disrupted classwork nor invaded the rights of other students. His speech was not part of a school-sponsored expressive activity such that listeners might believe that [Plaintiff's] speech had the imprimatur of school sponsorship.

*Id*. at 1238. The Tenth Circuit then proceeded to the qualified immunity question, finding that the school officials were not entitled to the defense at the motion to dismiss stage because "the complaint states a claim that Defendants violated clearly established law when [Plaintiff] was dismissed from the football team because of his speech." *Id*. In support of its conclusion, the Tenth Circuit reasoned that it was well-stablished "that the government may not deny a benefit to a person because of his constitutionally protected interests[.]" *Id*. Accordingly, the Tenth Circuit reversed the district court's dismissal of the high school football player's First Amendment retaliation claim, but it left open the possibility for the school officials to raise the issue of qualified immunity at the summary judgment stage. *Id.* at 1238-39.

In *Seamons II*, which involved the same parties, the Tenth Circuit considered whether the district court erred by granting summary judgment to all defendants on the high school football player's First Amendment retaliation claim. 206 F.3d at 1023. The district court concluded that the school officials were entitled to qualified immunity on the football player's First Amendment retaliation claim. *Id*. at 1024. In determining that the district court's qualified immunity analysis was flawed, the Tenth Circuit observed that "extensive case law in 1993" supported the proposition "that school authorities may not penalize students for their speech when that speech is non-disruptive, non-obscene, and not school-sponsored." *Id*. at 1030. Additionally, the Court stated that "[o]ther cases involving student athletics had indicated prior to incident here that coaches may

not penalize players for engaging in peaceful speech activity which does not create substantial disorder, materially disrupt classwork, or invade the right of others." *Id.* Accordingly, the Tenth Circuit concluded that the district court had erred in granting summary judgment on the basis of qualified immunity. *Id.* at 1030-31.

While the facts in *Seamons I* and *II* are not precisely identical to the facts of the present case, this is of no import in determining whether the law was clearly established because "precise factual correlation between the then-existing law and the case at hand is not required." *Patrick*, 953 F.2d at 1249 (quoting *Snell v. Tunnell*, 920 F.2d 673, 699 (10th Cir. 1990)). Moreover, the import of *Seamons I* and *II* is that high school athletes may not be denied participation on a school's athletics team due to their protected speech. Given the clear teachings of *Seamons I* and *II*, the Court is compelled to conclude that the law was clearly established.

Accordingly, Coach Trujillo is not entitled to qualified immunity at the summary judgment stage.

**c. Plaintiff's NMCRA Claim Against the Board**

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's NMCRA claim against the Board, which alleges Plaintiff was retaliated against for exercising his right to free speech under the New Mexico Constitution, for two reasons. First, they contend the Court lacks subject-matter jurisdiction over this claim because such claims are required to be brought first in New Mexico state courts. Mot. at 15. Second, and in the alternative, Defendants assert that they are entitled to summary judgment on this claim because "there is no constitutional violation, and Plaintiff has not adduced any facts to supports his allegations." *Id*. at 16.

In his Response, Plaintiff argues that the Court may exercise supplemental jurisdiction over his NMCRA claim pursuant to 28 U.S.C. § 1367(a). ECF No. 52 at 23. In support of this argument,

Plaintiff notes that federal district courts typically decline to exercise supplemental jurisdiction over certain claims in limited circumstances, such as "where novel or complex state-law issues predominate, where the state claim substantially predominates, or where the Court has dismissed all claims over which it has original jurisdiction." *Id*. However, Plaintiff does not offer a response to the Defendants' argument that they are entitled to summary judgment on his NMCRA claim because he has not adduced sufficient facts to support his allegations. Ultimately, the Court agrees with Defendants that it does not have subject-matter jurisdiction over Plaintiff's NMCRA claim. Additionally, the Court concludes, contrary to Plaintiff's argument, that it may not exercise supplemental jurisdiction over this claim.

The NMRCA explicitly provides that a plaintiff who claims to suffer a deprivation of any right "pursuant to the bill of rights of the constitution of New Mexico" may maintain an action "in any New Mexico district court." N.M. Stat. Ann. § 41-4A-3(B) (1978). While the NMCRA waives the state's sovereign immunity for claims brought in New Mexico state court, *see id.* §§ 41-4A-3(B), 41-4A-9, the act also provides that it "shall not abrogate judicial immunity, legislative immunity or any other constitutional, statutory or common law immunity[,]"*id.* § 41-4A-10. This is important because courts within this district have concluded that the NMCRA only waives the state's sovereign immunity for claims brought in New Mexico state court but does not do so for claims brought in federal court. *See O'Flaherty v. U.S. Marshals Serv.*, No. 1:23-cv-0389-KWR-GJF, 2024 WL 3342520, at *2 (D.N.M. July 9, 2024) ("The New Mexico Civil Rights Act does not waive the State's sovereign immunity for suits brought in federal court."); *see also Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1181 (D.N.M. 2021) (concluding that the NMCRA's waiver of sovereign immunity "is limited to actions commenced in 'any New Mexico district court.'" (citation omitted)).

Because the NMCRA does not waive the state's sovereign immunity for claims brought in federal court, the Court is compelled to conclude that it lacks subject matter jurisdiction over Plaintiff's NMCRA claim. *See Peña Lee*, 794 F. Supp. 3d at 1092 (concluding that the Court lacked jurisdiction over Plaintiff's NMCRA claims because they were not brought in New Mexico state court); *see also Way v. Hatch*, 1:23-cv-00223-WJ-JMR, 2025 WL 776608, at *5 (D.N.M. Mar. 11, 2025) ("Because the New Mexico Civil Rights Act does not clearly waive sovereign immunity in federal court, I agree with the other judges who have decided this issue. This Court lacks jurisdiction over New Mexico Civil Rights Act claims that did not originate in state court."); *see also Harrell v. United States*, 443 F.3d 1231, 1234 (10th Cir. 2006) ("Absent express waiver of sovereign immunity, federal courts lack subject matter jurisdiction . . . ."). And while Defendants have raised this argument in their Motion for the first time, issues of subject matter jurisdiction, including the issue of sovereign immunity, can be raised at any time. *See Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); *Cheyenne-Arapaho Gaming Comm'n v. Nat'l Indian Gaming Comm'n*, 214 F. Supp. 2d 1155, 1164 (N.D. Okla. 2002) ("[Q]uestions of sovereign immunity may be raised at any time in the proceedings of a case.").

Additionally, the Court rejects Plaintiff's argument that the Court may permissibly exercise supplemental jurisdiction over his NMCRA claim. In the context of the claims brought under the New Mexico Tort Claims Act ("NMTCA"), which similarly provides that claims brought pursuant to that act are within the exclusive jurisdiction of "the district courts of New Mexico," N.M. Stat. Ann. § 41-4-18(A) (1978), courts may not exercise supplemental jurisdiction over such claims, *see Quarrie v. N.M. Inst. of Mining & Tech.*, No. 13-cv-0349 MV/SMV, 2014 WL 11456598, at

*2 (D.N.M. Feb. 25, 2014) ("Sovereign immunity under the Eleventh Amendment is not abrogated by 28 U.S.C. § 1367, and therefore, § 1367 does not authorize federal district courts to exercise jurisdiction over claims against nonconsenting states."), *report and recommendation adopted*, No. 13-cv-0349 MV/SMV, 2014 WL 11456608 (D.N.M. Apr. 3, 2014). The reasoning of *Quarrie* has been extended to claims brought under the NMCRA. *See Valdez*, 559 F. Supp. 3d at 1181 (concluding that the Court could not exercise supplemental jurisdiction over Plaintiff's claims under the NMCRA because the act did not waive sovereign immunity). Plaintiff has not offered any reason to depart from *Valdez,* and the Court sees no reason to do so. Accordingly, the Court concludes that it may not exercise supplemental jurisdiction over Plaintiff's claim under the NMCRA.

Alternatively, as the Defendants point out, Plaintiff has not responded to the Defendants' alternative argument that they are entitled to summary judgment on the merits of his NMRCA claim. A party's failure to respond to an argument raised by an opposing party generally leads courts to determine that the issue is waived. *See Rock Roofing, LLC v. Travelers Cas. and Sur. Co. of Am.*, 413 F. Supp. 3d 1122, 1128 (D.N.M. 2019) ("Plaintiff fails to substantively respond to this issue in either its response or its surreply and has, therefore, waived the issue."); *Zane v. Kramer*, 195 F. Supp. 3d 1243, 1256 (W.D. Okla. 2016) (concluding plaintiffs waived argument that they did respond to that was contained in the defendants' summary judgment motion). Therefore, the Court also finds that Defendants are entitled to summary judgment on the merits of Plaintiff's NMCRA claim because Plaintiff has not offered any substantive argument on this point in his response and has waived the issue.

## VI. Conclusion

Therefore, it is **HEREBY ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 49, is **GRANTED IN PART AND DENIED IN PART** consistent with this Order, and specifically it is

1. **GRANTED** as to the First Amendment retaliation claim asserted against Coach Dominguez in Count I;
2. **DENIED** as to the First Amendment retaliation claim asserted against Coach Trujillo in Count I; and
3. **GRANTED** as to the NMCRA claim asserted against the Board in Count II.

Margaret Strickland

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE